Judge Rowan
delivered the opinion of the court.
The questions to be considered by the court in this case, are, 1st: Is it competent for the state of Kentucky to tax the office of discount and deposit located by the president and directors of the Bank of the United States, at the town of Lexington, within this state? 2d. May the state tax the capital stock of that office? And 3d. If the state may impose a tax upon either that office or its capital stock, is the act of the legislature, entitled “an act to tax banks in, this commonwealth, approved February 3d, 1818,” by virtue of which this action was instituted, a valid act?
Influenced as well by the importance and difficulty of the topics involved in this case, and the responsibility inseparable from a decision of them, as by a diffidence in our own powers, we felt an emphatic wish that this cup might be let to pass. But the case is of that description in which, from the organization of the court, an appeal was matter *76 of right with the plaintiff, and we were constrained to submit our wish to his will.
To ascertain and define, with the requisite precision and exactness, the limits to be observed by the states and the nation, in the exercise of their respective powers, must always be a delicate and frequently a difficult task. The delicacy and difficulty are greatly enhanced when the power to be exercised is claimed by implication: construction must then be employed, and the tendency of power to enlarge itself, is but too apt to be displayed in that construction. This tendency of power is proverbial: it is illustrated by the history of almost all the governments of which we have any knowledge. Yet upon the repression of that tendency, and the confinement of each to the exercise of its legitimate energies, and within its appropriate sphere, must essentially depend the well being and prosperity of the United States. The difficulty of effecting this great object, produced and propagated the sentiment, that a government within a government was impracticable. So prevalent was this sentiment anterior to the American revolution; so universally was the notion of imperium in imperio held in derision by the sages of that day, and of all time prior thereto, that no statesman, it is believed, to whom, upon the achievement of our independence, the task of forming a government might have been assigned, would have thought of parcelling out the territory into thirteen different sovereignties, as the wisest and best mean of obtaining an energetic, tranquil, and durable national government. But the thirteen states existed, at that period, each in the plenitude of its sovereignty.
The necessity of a national government was strongly felt and promptly acknowledged by the states. The constitution of the United States was framed and adopted, not upon the destruction, but through the agency, and for the preservation of the states. The title of that instrument, as well as its entire contexture, is strongly evincive of the regard which was had in its promotion to the existing state sovereignties. It was no sooner framed and adopted, than it was hailed by the patriots and sages of America as a magnificient stranger in the world, well qualified to reverse practically the erroneous sentiment which had been theretofore entertained in relation to the doctrine of imperium in imperio, and to rescue that doctrine from the odium and derision to which it had been so long unmeritedly (as they be *77 lieved) exposed. They viewed in the thirteen existing republics, the materials furnished, as they fondly hoped, by celestial agency, for a great national republic of interminable duration. While they saw in the surrender made by the states of a portion of their sovereign power a deposit formed, competent to all the purposes of national sovreignty, they saw also, that the powers composing the national stock were enumerated, specified, and defined; and they saw the retention by each state of so much sovereign power as left it competent to all the purposes of interior police, and to every purpose of sovereignty not incompatible with its associated and intervolved position. They relied with confidence on the quantity of power retained by the states, and the quantity and defined character of that delegated to the nation, and upon the vigilance inseparable from power in whatever shape, as a safe guarantee against the encroachments of either, upon the province of the other. They anticipated, as the pleasing result of this mutual vigilance and repulsion by the national and state governments, the duration of their existence and the exemption of the people from oppression by either: That their tendencies to enlargement would be fruitlessly and harmlessly checked by, and exhausted upon, each other, and the people left in the enjoyment, perpetually, of rational civil liberty. It was in these anticipations that the wisdom and excellence of an involuted government was discerned. How far they are destined to be realized, remains to be unfolded by time.
The doctrine contended for in this case, should it prevail, is calculated to damp the ardor and limit the hopes of the most enthusiastic admirers of the American government. It is urged on the part of the appellee, that this office, because it is located by a corporation erected by the nation, and employed as its fiscal agent, is exempt from taxation by the state in which it is located; that the states are mere petty corporations, permitted, under a fair construction of the constitution of the United States, to act as to some minor points only of interior police; that they were examinated by the adoption of that instrument; that their existence, in their present denuded state, was recognized by the people, who alone formed it, and whose exclusively it is, as matter of policy, not of utility; that the existing circumstances, and the state of the times, required that an ostensible but unreal agency, that a seeming but unreal importance should, in that instrument, be conceded to the states; *78 and that they were happily conciliated and duped by the adroitness of the patriots who formed it.
In that view it is contended that the 18th clause of the8th section of the 1st article, was smuggled into the constitution. These sentiments we feel constrained to repel. The patriots who formed that constitution were wise, not cunning;—cunning is in relation to wisdom, what hypocricy is to true religion—a low mimicry, despised by the wise, and practised only by the weak. The name of Washington alone, in whose presence cunning never dared to display itself, refutes every such sentiment. But if the force of that venerable name were absent, a fair construction of the constitution would supply its place, and negative such sentiments. Upon the first and last clause of the 8th section aforesaid, a reliance is had for the power of congress to create this corporation, and from the power in that body to erect the corporation, its exemption from taxation by the state in which it is placed, is deduced. In the construction of those clauses, or of the constitution or any part of it, we think it wholly unnecessary to ascertain whether it was formed by the people, or by the states, or by the conjoint agency of both: The powers possessed by the nation must be the same, whether they be derived from the one, or the other, or from both. Being enumerated and defined, their extent depends not upon the source whence they were derived, but upon the import of the terms employed in defining and conferring them. The state governments were formed, by the people upon their renunciation of their colonial relations: The national government was formed by the people in their state attitudes. The state governments were in full vigor, and there existed between each and the people thereof, all the relations, rights and duties, inseparable from that kind of government, when the constitution of the nation was formed. The states appointed for that service the persons by whom it was framed, and they, as representatives of the states, ordained by the 7th article thereof, that its ratification by the convention of nine states, should be sufficient for its establishment among the states so ratifying it. Its submission to a convention in each state for adoption, was moreover with the assent and by the procurement of those states. The relation between the people and their state, governments was not, in the progress of its formation and, adoption, for a moment dissolved; it existed in the plenitude of its efficacy. The states spake as audibly through *79 their conventions in the adoption of the constitution as the people had spoken through the states in its formation. The language in both instances was that of the people, not in a state of abstraction from, but in full alliance with, and uttered through their state governments—they spake and acted in that matter throughout, in their political and incorporated character. In republicks, the machinery of the government is created by, and belongs to, the people; it is moved by their power and directed by their mediate or immediate will: Its motion imports their agency, its direction their will, and its language their sentiments. It may, therefore, be said with equal truth, that the constitution was formed by the people or by the states; and using either mode of expression, the states having been at that time plenary sovereigns, must be considered now as less so, by the destitution of so much power only, as was expressly, or by fair implication, delegated to the nation by that instrument.
The 1st and 18th clauses of the 8th sec. of the 1st art of the constitution expounded.
If the power to create a corporation in any of the states is possessed by the Congress, that body must derive it by implication, for it is no where in the constitution expressly given. The power to create corporations is, it will be readily admitted, inherent in plenary sovereigns, and of course the power of Congress to create corporations in Columbia, or in any territory or place over which it has the exclusive right to legislate, ought never to have been doubted; for in those places there can be no obstruction to the exercise of the power of the sovereign according to its will. But the right of Congress to create and locate a corporation upon the territory and within the sphere of another sovereign, is a different, and the present, question. The 1st and 18th clauses of the 8th section of the 1st article above alluded to, taken together, read in the following words, viz:—
“The Congress shall have power to lay and collect taxes, “duties, imposts, and excises, to pay debts and provide for “the common defence and general welfare of the United States; “and to make all laws which shall be necessary and proper “for carrying into execution the foregoing powers, and all “other powers vested by this constitution in the government “of the United States, or any department or officer thereof.”
The power to lay and collect taxes, is here expressly given to Congress, in connection with a recital of the objects to which the taxes, when collected, may be legitimately applied. That recital was, as we think, on the part of the *80 appellee, erroneously construed into a positive and distinct grant of indefinite power: and hence, we suppose, resulted many of those incongruous, and inappropriate sentiments in relation to the extent and character of state powers, to which we have before alluded. The power to lay and collect taxes being expressly given, it is contended that the power to create this corporation is conferred on the Congress by the last of the two above recited clauses: That a bank is an agent necessary and proper to the collection and transmission of the taxes of the nation. It is a rule, not less of reason than of law, that where the end is expressly the means necessary to the effectuation of that end are given by implication. But in the construction and application of this rule, courts have uniformly, as we believe, restricted the agent to the use of those means only, without which the end must fail.
Where a power is given, the means necessary to effectuate that power is implied: ant. Pendergast vs. Gwathmy, acc.
The term "necessary" means that without which another ceases to exist!
The clause of the 8th section, last above referred to, imports nothing more than an expression of what existed by implication, according to the above recited rule. It confers no power on the Congress which that body did not possess anterior to its insertion in the constitution. It was inserted no doubt ex abundante cautela. It was feared by those who were zealous for state rights, that the Congress, if left to implication, might encroach upon those rights. It was not less feared by those who were anxious that the new government should possess competent powers, that the states might attempt to restrict the Congress to the exercise of the powers expressly given, and deny to it the right to legislate upon power derived by implication or construction: So that the question, whether this corporation is a necessary and proper mean or agent, in the collection and transmission of the national taxes, presents itself not less in the construction of the first of the two above recited clauses, taken by itself, than of the two taken together. According to a fair construction of the first clause, if a bank be necessary and proper to the collection and transmission of the taxes, the congress had, by clear implication, the power to create it; upon the same hypothesis they possessed, under the last clause, the express power to create it. But if it be not a necessary agent, they do not possess that power, either by implication or expression. Its being a proper mean or agent, does not confer, or aid in the conference, of that power; it must be necessary and proper—however proper, it cannot be employed unless it be also a necessary *81 agent—no interpretation can be given to the word proper, which does not affirm and strengthen the import of the word necessary. Medicine is necessary in a case of sickness, but that only should be administered, which, in addition to its being necessary, is proper for the malady under which the patient labors. The meaning of this word necessary, is furnished not less by its etymology, than its use by approved writers. Whether it he derived from the Latin words ne and cesso, or from nec and esse in the same language, it equally imports a thing without which, another thing must fail, yield or cease to be. In this sense it is used alike by the scholar, the man of science, and the jurist. From the chemist we learn that a given quantity of heat is necessary to the fusion of metal; that a given quantity of the same article is necessary to raise water to the boiling state, and an increased quantity to bring it to the æriform state. Heat, in the three above instances, is the thing imported by the word necessary, without which the other things, viz: the fluid state of metal, the boiling state of water, and its æriform state, could not be produced or exist. From the philosopher, we learn that the action of the heart in man and other animals, is necessary to the circulation of the blood, and that the circulation of the blood is necessary to animal life. We learn from the same quarter, that the moon is necessary to the action of the ocean; that that action is necessary to the purity of water; that the purity of the water is necessary to the health and life of fish, and other aquatic animals occupying that element.
The import of the word necessary, in the above instances, cannot be mistaken. The very able and profound jurist, chief justice Marshall, uses this word in the sense here contended for: Thus, on the case of the United States against Aaron Burr, in 4th Cranch, page 477—“Actual violence is a necessary ingredient in constituting the fact of levying war’’ And again, at the bottom of the same page—“It is obvious that lord Hale supposed an assemblage of men in force to be necessary to constitute the fact of levying war.” And again, in pa. 480 of the same book: “Examples given shew, that contemplated actual force, is a necessary ingredient in this crime.” The above are a few, selected from very many instances, in which the chief justice has used this word to import one thing without which another could not exist. In these instances, violence or force is the one thing imported by the word necessary *82 without which the other thing, viz. war or treason, could not exist. In this sense, this word is used by Blackstone, Gilbert, Hale, Hawkins, and indeed by all the respectable law writers.
But its use in other parts of the constitution, is most decisively illustrative of its signification in this clause. The statesmen who formed that instrument knew, and weighed well, the import of the words employed therein. Thus, in the 3d clause of the 7th section of the 1st article—“Every order, resolution or vote, to which the concurrence of the senate and house of representatives may be necessary, (except, &c.) shall be presented to the president of the United States, and before the same shall take effect, be approved by him.” And again, in the 3d clause of the 1st section of the 2d article: “But in choosing a president, the votes shall be taken by states, the representatives of each state having one vote, &c. and a majority of all the states shall be necessary to a choice.” A choice of president could not be, take place or exist, without a majority of the states, which majority is the thing imported by the word necessary, without which the other thing, viz. the choice of a president, could not be or exist. And again, in the 12th amendment to the constitution, this word is twice employed, once in relation to the choice of the president, and once in relation to the choice of the vice president of the United States, in the same sense and in the same import, in which it had been used in the clauses above recited, and it is a sound rule of construction, that the same word, repeatedly used by the same person, in the same instrument, in relation to the same subject, shall have the same import.
But it is believed that this word is never gravely employed in relation to any subject of interest or importance, in any other sense than the one above assigned to it. It is true, that the increased interest or importance of the topic upon which it is employed, sometimes exacts from the person using it, annexed epithets, such as essentially, absolutely, indispensibly, &c. which evince the ardor of the writer, and without varying, heighten the glow of the impression made by its import. Those epithets do not increase the import of the word, but shew an increased consciousness in the speaker or writer, of the importance and necessity of the thing imported thereby, to the existence of the thing to which its import is applied. When we say that food is necessary to the existence of human life, and, in re *83 peating the sentence, superadd the epithet essentially, we do not thereby increase the import of the word necessary, but shew our increased consciousness of the importance of its import.
But it is said that this word may be compared; that we may say necessary, more necessary, and most necessary; and what then? Is a majority of all the states necessary to the choice of a president of the United States, and is the same majority more necessary and most necessary to that object? When we say that wealth is necessary, knowledge is more necessary, and health most necessary, to human comfort, we are understood, and use the degrees of comparison in the only way in which that word is susceptible of them. There are three objects, the second more important than the first, the third more important than the second, to the existence of each some other thing is necessary. The existence of that other thing is equally necessary to the existence of its correspondent object. To the existence of the last object, we say, that the thing without which it cannot exist, is most necessary. The sign of the superlative here, indicates the preference of the third object to the other two, without varying or increasing the import of the word necessary.
But it is said that this word, besides its natural, has a figurative import; that it is sometimes used figuratively. In poetry it may, and perhaps in romance; but in the constitutions of the nation and states, in their legislative acts, and in the treaties made by this with other nations, it is used in its plain prose import. We would smile at a figurative yard-stick, ounce or pound weight, quart or gallon measure—and it would be difficult to have them sealed in their figurative character; and yet, as by those measures and weights, we ascertain and apportion the quantities of material and tangible substances, so do we, by words, as certain and apportion intangible and incorporeal substances, such as powers and privileges; and as, by how much the more any material substance, of which we are about to dispose, is valuable and precious, by so much the more do we ascertain with precision and accuracy, by the established weights and measures, the quantity to be disposed of; so in immaterial and intangible substances; by how much the more they are estimable and interesting; by so much the more, do we with caution, measure by the use of words, of well defined, fixed and exact import, the precise quan *84 tity of which we are about to dispose—words of floating or figurative meaning are never employed on such occasions. It cannot therefore be conceded that the word necessary is synonymous or convertible with the word convenient; as well might it be said to be convertible with the term useful, expedient, suitable, eligible, agreeable, desirable, &c. Such licentiousness of interpretation would confound the language and jeopardize the best interests of man. Discretion might thereby usurp the rights and dictate the duties of the states, and of the American people. Government, upon any pactional or conventional principle, could not exist. The alternative between despotism and anarchy, those frightful extremes, would alone be presented.
That banks furnish to the government of a nation increased facilities, in the collection and transmission of its taxes, is probable, and may be admitted: But that a government can collect and transmit its taxes, and attain to the highest pitch of prosperity and splendor, without the agency of banks, can be denied by none who have paid the slightest attention to the history of nations. Banks have been but lately employed in that service. Nations have reached the highest martial and commercial splendor without their agency. They were not necessary to the splendor or duration of the governments of either Carthage or Rome, both of which were martial, and the former greatly commercial: nor were they necessary to the literature, science or refinement of Greece. They were entirely unknown and of course unemployed as fiscal agents in any of those governments. It does not seem to have occured to the wisdom of even Solomon that they were necessary agents in the management of the fiscal concerns of an extensive and highly commercial empire. The pacific state of that empire, and the wisdom of its monarch, were very favorable to the discovery and adoption of every instrument which was necessary, or might be even usefully employed, in collecting and concentrating at Jerusalem the vast revenues which were exacted from the tributary provinces. The conquests of Alexander the Great, Cæsar, Henry the 4th, of France, Charles the 5th, and Frederick the Great, were achieved and maintained without the aid of banks: nor is it believed that the more recent, though not less splendid achievements of Napoleon, were facilitated in any considerable degree by the agency of this species of corporation. Nor was a bank employed by England in the most wholesome and energetic *85 periods of that government; and what has been and will be its effect upon the destinies of that nation, it is difficult, if it were proper, here to conjecture. It cannot, however, have escaped the notice of the attentive observer, that while the bank afforded to that government facilities in the management of its fiscal concerns, it afforded also facilities, and perhaps many inducements, to the creation of that unwieldy and enormous public debt, under the pressure of which, as of a mighty incubus, it now labors.
As the revenue system could exist without banks, they were no necessary to that system, and then establishment within any of estates, not within the legitimate sphere of congressional power, and their location within a state is as if done by a foreign nation!!!
If, then, banks were not, until lately, employed as fiscal agents by any of the governments with which history makes us acquainted; and if many of them have been prosperous in their pacific and commercial state, and splendid in war; and if the collection and transmission of taxes were necessary to their prosperity and splendor—we may fairly infer that banks are not necessary as revenue agents to the prosperity or splendor of a government. We cannot therefore suppose that the taxes of the American government cannot be well collected and transmitted without the agency of banks, and consequently are of opinion, that the location, by the nation, of banks within the states, is not necessary to the collection and transmission of its taxes; and not being necessary for that or any other purpose, within the scope of the power which the nation can constitutionally exercise within any of the states, the congress did not possess the power to create and locate them therein.
When the power to lay and collect taxes was delegated to the nation, it was to be exercised by the nation, concurrently with the exercise of the same power by the states, with the exception, on the part of the latter, of the power to lay imposts, &c. Taxation was as necessary to the existence of the states as of the nation. It was necessary to both: neither could exist without it. The power in both was sovereign, and neither sovereign can exercise its acknowledged power injuriously to the power or rights of the other; still less can the nation, whose powers are specific and express, invest itself by construction with a power, under the pretext that it is incident to one expressly given, and exercise it injuriously to the states, in preference to that competent incidental power, which might be innocently exercised, and the exercise of which, as an incidental power, convenient and competent to its end, had been consecrated by the usage of nations, with but few, and those unwinning exceptions, throughout past ages. The territory and the *86 people of America belong to the states respectively within which they are. Each state is the sovereign of the people and the soil within its limits, as to all the objects of interior sovereignty. The soil and other taxable subjects within the states, may be vested by the nation for the special purpose of taxation, as may be the people on special occasions, and for special purposes. But the special rights of the nation as to either, imply conclusively the general sovereignty and proprietorship of the states as to both. Now, in the case where one man has a right of ingress and egress for a special purpose upon the lands of another, the law will constrain him to exercise the right in that of two, or more, practicable modes which shall be the least injurious to the proprietor. The reason of this rule must be obvious—for if the person possessing the right might exercise it in any one mode other than the one least injurious to the proprietor, he might exercise it in any and every other mode the most injurious to the proprietor, to the destruction of his proprietary use of the lands, and his fee simple therein: so in the present case—If the nation may adopt anyone mode of collecting and transmitting her revenue other than that, least injurious, long used, practicable mode, she may adopt any, and every other, the most injurious mode, to the utter prostration of the states. Where is the limit, when she has departed from that practicable mode which is least injurious to the states? May she not, as some governments have done, farm her revenues; that is, sell out the revenue of the states for a sum in gross, to be paid annually? Might it not be thought convenient to do so, and invest the vendee with the power of collecting, and assigning too, the appropriate contribative sums; and might not the words necessary and proper be construed to import such an authority, at least, when taken, the former as a comparative word, and in a figurative sense? The care and transmission of the revenue of the nation is now let to the bank of the United States and its branches, at the price, and upon the terms contained in its charter. Might not the banks, by an extension of the principle, be invested with the power (upon their purchase of the nation’s revenues) of collecting it by agents of their own appointment?
Where rights are concurrent with individuals or states, each should exercise them with the least possible inconvenience to the other. Sic utere tuo at aliemum non edas.
If, then, the nation has not the power to create and locate a bank within the state of Kentucky, and we most solemnly believe that she does not possess that power, it follows that the state has a right to tax the bank which she has created *87 and placed therein, as much as if it had been placed therein by France or England. In either of the cases the bank could exist within the state but by her permission, and that permission may be gratuitous, or upon terms, at her pleasure. But upon the supposition that we are mistaken upon this point, and the nation has a right to create and locate this bank within this state, it remains to enquire whether the state may not tax its capital stock?
In the progress of this enquiry the extent and character of the taxing power possessed by the states, should be first considered. By ascertaining to what extent they possessed that power, anterior to the erection of the national government, and to what extent they surrendered it when that government was formed, and deducting the amount of the portion surrendered, from that which was retained, we will have in the remainder the quantity which they now possess, and may justly exercise. That the state swere plenary sovereigns then, must be admitted by even the strongest advocates for their humiliation now. Among the powers conceded to the general government there are many to be exercised exclusively by the nation, such as the power of making treaties, declaring war, coining money, &c. But, that the power of taxation is not thus exclusively given, is evident not only from the import of the words employed in conveying that power, but from the consideration that the states, whose co-existence with that of the national government is recognized in the constitution of the nation, needed the exercise of that power. The states are, in that instrument, intertwined with the national government as essential parts thereof. They could not be considered competent to subserve the purposes of their destination as constituent parts of that government, in any other than a sovereign character. The senate, the most important pillar in the fabric of that government, is composed entirely of state materials. It is in the government of the nation, the representative of the sovereignty of the states, and was destined not only to check and control popular fervors, executive aberrations and judicial delinquencies, but to infuse into executive agency its monitory influence. That its capacity corresponds with its destination, may be discerned not less in the sovereign character of the materials of which it is composed, than in the modification of those materials as displayed in the constitution.
This mighty pillar (to resume the figure) so well calcula *88 ted to sustain the governmental fabric, and promote its duration, is itself sustained by the state sovereignties. They form the great pedestal upon which it is based. To the states, in their sovereign character, is reserved, in a certain event, the election of the President of the United States. A conjuncture has already occurred, in which their sovereign agency was exerted in the election of a president. They possess respectively the machinery of sovereign power, legislative, judicial and executive. They possess and exercise the power of life and death, than which no power is more indicative of sovereignty. The denial therefore of sovreignty to the states, is not only a disparagement of their governments, but an imputation upon the constitution of the United States, which the nation, instead of conniving at, should be among the first to refute; for by enfeebling the sovereignty of the states, she weakens and loosens the pillars which support her own fabrick, and like the strong man in the temple at Gaza, and like him blind too, by a desperate effort of strength, she prostrates the pillars, subverts the fabric, and perishes in the ruins. Those who deny sovereignty to the states seem to think that it consists, and can only consist, in the exercise of all the powers of the sovereign, as well those which may be exercised upon the exterior relations as interior concerns of a nation. They forget that upon this hypothesis the nation itself would not be sovereign; while it possesses all the power of regulating the exterior relations, it possesses but few of the powers by which the internal concerns of the United States are directed.
The powers conceded by the states to the nation were sovereign; but they did not concede all the sovereign power which they possessed, nor did what they retained become less sovereign by the concession, more than what they granted become less sovereign by the retention: neither was reduced or degraded by that process. The character of power is not to be ascertained exclusively by the multitude or paucity of the subjects upon which it is or may be exercised. England is not more a sovereign since than before the union; she is not less a sovereign since than before the loss of her colonies; nor is America more sovereign since than before the acquisition of Louisiana; nor are the states less sovereign in relation to the subjects upon which they retained the power to act, since than before the adoption of the constitution of the United States. The number of the sub *89 jects upon which they can act are greatly diminished, but their power to act upon appropriate subjects is still sovereign. The power of a state displayed through its judiciary, in the condemnation and execution of a malefactor, is in no wise less sovereign now, than it was before the government of the U. S. was formed. In most cases, what the nation can do, the states cannot, and what the states can do, the he nation cannot. The arguments drawn from that class of cases, in which they possess respectively, exclusive powers, as well as those drawn from that class in which they possess concurrent powers, are alike availing, or alike impotent, to impeach the sovereignty of either. Each is sovereign within its sphere. The taxing power is inherent in sovereignty, and must, upon the supposition that the states are sovereign, belong to them, unless it can be shewn that they have surrendered it. That they have surrendered it, is not pretended, and that they have not is evident, not only because they needed it, but because the retention of it is clearly indicated by the modified shape in which the concurrent exercise of that power is, in the constitution, granted by the states to the nation. This sentiment is fortified by the exception, from the taxing power, possessed by the states, of the power to lay imposts or duties upon imports or exports, and tonnage.—The special negation of this power to the states, in the constitution of the United States, is a recognition and affirmance of their general taxing power.
The state governments are supremely sovereign as to all the attributes of sovereignty not granted exclusively to the national government; the direct taxing power is concurrent and in its exercise the states are sovereign:—As to duties and imposts, the right is granted to the general government.
The power of the sovereign over the property within his dominion, is conceded by all. The sovereign may, by legislative enactions, prescribe the mode in which it shall be acquired, transferred, and used or employed most conducively to the public weal. He may subject it to subsidies or taxes, and in particular cases, when it may be necessary to the safety of the government, or to some great object essentially connected therewith, he may exercise the dominum eminens, or transcendental power. Of these powers, that of taxation only, requires at this time our special attention. All the arguments in favor of good government, drawn from its beneficial effects, and particularly those which assert the ascendency of science, civilization and order, over ignorance, barbarism and anarchy, conspire to invest the sovereign with this power. Without it, government would be a lifeless and useless machine. Money is the sinews of a government, and can only be raised by the exertion of the taxing power.
*90 The arguments, therefore, which are urged against the right of the state to tax this stock, as they are drawn from the necessity of the exercise of the taxing power by the nation, are, when duly considered, but so many arguments in favor of its exercise by the state. For it must not be forgotten, that the state and nation are co-ordinate sovereigns, by each of whom the power of taxation is alike possessed, and to each of whom it is alike essential and important. The state, with the exception of the power to lay duties, &c. possesses at least in as high a degree, the power of taxing all property, other than that of the nation, within its limits, as the nation possesses of taxing all property not belonging to the states, within its boundaries. Whether either can tax the property of the other, need not here be discussed. Property is a generic term, and includes money. Indeed money is the most active shape of property, and from the consideration of its fitness in kind for governmental uses, would be the most appropriate subject of taxation; but it is difficult of access, from the activity and currency of its character, the concealment with which it circulates, and the facility with which its circulation may be concealed, forbid a reliance upon it as the exclusive subject. But in a state where taxation obtains upon the advalorem principle, money, when it is stationary and obvious, presents itself among other subjects, with the preferences above mentioned. The right of the sovereign to tax money, as well as any other kind of property, or in preference to any other, or to pretermit it, cannot be questioned. But it belongs not to co-ordinate sovereigns to question the right of the acts of each other. That sovereign that can be questioned, ceases thereby to be sovereign and becomes a vassal. Can the national government question the correctness or legitimacy, of an appointment made by the executive of a state, by and with or without the advice and consent of the senate thereof, or can either of the states question the correctness of such an appointment by the executive of the other? Certainly not. As little can the nation question the correctness of the exercise of the sovereign taxing power of the state. The power of the nation to lay and collect taxes, is no more than sovereign; it cannot, therefore, be greater than that of the state which is not less than sovereign. Sovereignty imports the utmost plenitude of power, and is of course irresponsible and impassive. Whatever a state may do as a sovereign, it does with as *91 much power, as any other sovereign could do the same thing. Sovereigns may, and do, differ exceedingly in their possession of physical force, extent of territory, resources, &c. But in their possession of abstract sovereign power, in relation to all the legitimate subjects of its exercise, they are equal.
The sovereign may tax every subject to which it affords protection. If a burglary were committed upon the banking house of that office, the prosecution, correction and punishment, would be in the name of the commonwealth of Kentucky. For the exclusive right of legislation can only be exercised by the congress over such places as shall be purchased by the nation from the state, with the consent of its legislature, for forts, magazines, &c. (see the 12th clause of the 8th section of the 1st article of the constitution:) and so in the case of arson, or any crime committed upon the property of that office or its officers. It is not in the power of congress to withdraw either the officers or the private funds of individuals in that office, from the jurisdiction of the state, and thereby dissolve the relation which necessarily exists between the persons and the property protected, and the protecting sovereign. It affords protection to both, and may, upon established principles of civil policy, act upon either, in the exaction of an equivalent.
In proportion to the importance of revenue to the well-being of government, is the concentrated energies of the sovereign displayed, in the exercise of the tax-gathering power—requisition is followed by distraint, demand is succeeded by instant execution, and a sovereign power is exerted which cannot be resisted or eluded. Sovereignty knows no superior, and if it did, it could not expect to find one in an equal or co-ordinate. The attempt on the part of the state or nation to resist or elude the exercise of this power by the other, might be reciprocated indefinitely and unavailingly, for where co-ordinate, or what is the same thing, equal powers oppose each other, inefficiency ensues. If the nation can, by a corporate device, withdraw the money within each state from taxation, may it not also, by the same device, and upon the same principle, withdraw from the state every other subject of taxation? May not the nation incorporate within each state, a bank of enormous amount to be subscribed in property, and might not the property within each state be subscribed as stock thereto, and become thereby exempt from taxation by the state? *92 That the nation would incorporate such banks, is very improbable, but that she could do it, if by a corporate device she can exempt money, there can be no doubt. The inaptitude of all property, other than money, for banking purposes, would furnish to the states that security against such a measure, which they could not find in the attributes of their own sovereignty. A sovereign cannot be a curtesy tenant of the taxing power. The idea of making a sovereign a pauper, depending upon the charity, and living upon the bounty, of an associated or neighboring sovereign, is utterly inadmissible; and yet, to such a mendicant posture might the states be reduced, by the extension of the principle contended for. But the states, to insure their sovereignty, must possess the power of taxation co-extensive with their limits. It is the power of self-preservation, which must be possessed by the sovereign in plenitude.
Though the revenue of the nation is not liable to taxation by the state governments, yet if she diverts those funds from their proper destination & applies them to traffic or stock jobing, within a state, they loose their character of revenue, and are as the money of individuals, proper subjects of taxation.
But it is said that the nation possesses one seventh of this stock, and that if the state can tax the remaining six sevenths thereof, it cannot tax that portion which is the property of the nation, and as the latter cannot be distinguished from that of the share-holders, she cannot tax any. It is not necessary to decide whether the state possesses the power to tax the money of the nation within its limits, in any possible aspect, in which it may be employed there: But while we have no hesitation to say, that the money of the nation employed within the limits of the state, as tax, as revenue, and devoted in that character to its appropriate purposes, is exempt from taxation by the state, we should have much hesitation to say that, clubbed with that of individuals, and devoted to gainful and usurious purposes, it should enjoy that exemption: We should incline to think, that thus diverted from its destination, and thus associated with the money of others, it looses its sanctity, ceases to be tax or revenue, and becomes money, and in that character like that with which it is associated, may be taxed for its protection by the state in which it is so employed. The nation may send its officers into and through each and every part of each state, to collect and transmit the taxes, which it may collect in that state: But we disincline to believe, that she may send her taxes when collected, into a state, and employ them there, as money, in banking, stock-jobbing &c. exempt from taxation by the state. But if she may, she cannot, by a combination with the citizens of the state and a comminglement of her funds with theirs, exempt *93 theirs from taxation by the state. It is a rule of law, that he who voluntarily mixes his property with that of another, so that, from the confluent and miscible character of the property, what was thrown in cannot be distinguished and severed from that among which it was thrown, shall loose. The reason of this rule is obvious in this case; for upon the supposition that the money of the individual stock-holders may be taxed, and that the money of the nation may not be taxed, by the state, and that the one cannot be distinguished and severed, in the process of taxation, from the other, (which is believed to be the fact,) the nation, by voluntarily mixing her funds with those of individuals, has reduced the state to the alternative of loosing its revenue upon the individual funds, or of taxing those belonging to her. In which case, according to the above rule, she must loose. It is moreover unreasonable to suppose that 1-7th should control 6-7ths—that the minor should control the major—as much so, as that an atom should gravitate a globe. But it is contended that the state in taxing, may destroy this bank, which would imply impotence in the nation—that it was not able to uphold and protect an institutution which it had created. If the nation, in the creation of this institution, mis-exercised its power, then it ought not to attempt to uphold and protect it, nor can it, by any legitimate effort, do so. If, however, the power was legitimately exercised in its creation, which in this part of the case is hypothetically admitted, then the argument is that the state shall not use its legitimate taxing power, least it should abuse it—an argument which, when applied to individual transaction, leads to paralysis and inertion, and is, ex consequenti, unavailing.
The power to do good is, throughout all agency, except that of absolute perfection, the power to do evil. If the power of action were denied to all who could not pervert it, Deity alone could act. But the doctrine upon which the agency of the world hangs, is the very reverse: It is that the power possessed may be used, subject to the responsibility of the agent for its abuse, and it is upon this principle alone that we have any just notion of morals, and of rewards and punishments. But sovereignty has a fictitious perfection and purity, which must be taken as real, and which cannot be controverted, and of course the abuse of its power cannot be imputed to a sovereign, in restraint of its legitimate energies. The maxim, that “the king can do no *94 wrong,” is not an idle device of royalty, formed to amuse or beguile the multitude, nor is the correspondent maxim, "that the voice of the people is the voice of God,” the offspring of the demagogue’s brain—they are both just inferences drawn from the most profound views of civil policy, and illustrate the position advanced in relation to the purity and perfection of sovereignty. It is not, that the king in a monarchy, or the people in a democracy, can do no wrong—for we know they are men, and of course partake of the frailties inseparable from human nature; as men, they err, frequently and egregiously: But it is the sovereignty with which they are invested, and in which they are merged, that is incapable of error; and this incapacity in the sovereign to err is matter of necessity: There is no tribunal before which the sovereign can be arraigned—his conduct examined—his errors and delinquencies detected—those errors corrected, and he punished. Sovereignty, therefore, whether displayed in the monarch or the multitude, possesses necessarily this putative perfection, and is, of course, necessarily irresponsible. Upon this purity and unerring character of sovereignty, depends all the jurisdictions which are exercised in the governments throughout the world. Government could not exist upon any other hypothesis.
If, then, it is admitted (and we think it must) that the states are sovereign, and as to taxation, (with the exception as to imposts, &c.) co-ordinate with the nation, the argument is utterly inadmissible. But it is inadmissible in other views. May not the states tax other subjects more than they can bear—to a destroying extent, and thereby diminish the resources of the nation? and what security is there that they will not, other than is to be found in the putative wisdom of sovereignty? But the argument that the state may abuse the taxing power to the destruction of the subject taxed, involves not only the impropriety of ascribing error, weakness and wickedness to a sovereign; but the further impropriety of ascribing to one or two co-ordinate sovereigns, this complicated frailty, and to the other a total exemption from it; and what is still worse, asserting for this other, the capacity and right of superintending and restraining that from vicious and erratic action, and that too (worst of all) by denying to it the power of acting. The argument is moreover predicated upon the ascription to the states of little less than absolute ideocy, of the folly of dest *95 roying the sources of their own nutrition and sustenance, a folly which involves the wickedness of suicide—unless, the subject should become barren. In that case, wisdom would recommend its destruction. Nature abhors sterility. Christ cursed the barren fig-tree, and it withered immediately.
But the argument is erroneous in the assumption of the fact, that the nation created this capital. The nation created the device by which the capital was drawn into the vaults of that office; but the money pre-existed the device, and was in its pre-existent character, subject to taxation by the state, whenever it was found therein. That money in the vaults of the banks is a fit subject for taxation, has been evinced by the nation. The capital in the vaults of the banks, in every state, has been taxed by the nation—even that which belonged exclusively to the states, and that too, by a tax laid on the corporate agency of the banks. Now, if the nation and states are co-ordinate sovereigns, as to the power of taxation, the taxing power which the former may exercise within its sphere, the latter may exercise within their spheres—and if there be any thing in the argument now used, it might then have been used by the states successfully. They might have urged the sanctity of the corporate character, and the necessary fiscal agency of their banks: They might have also urged that the stock therein, at least that which belonged exclusively to them, should be exempt from taxation: They might have superadded that the nation, by taxing, might destroy their fiscal devices. But the nation, as if conscious that these arguments were unavailing, imposed and collected the tax—thereby asserting practically that neither the corporate character of the device, its utility to the states as a fiscal agent, nor the money in the vaults thereof, were, or ought to be, exempt from taxation by the nation.
It may, therefore, be safely asserted, taking the states and nation to be co-ordinate sovereigns as to the power of taxation, upon the authority of the latter, that banks may be taxed—that money employed in banking by the states, may be taxed, in common with that so employed by individuals; and we have no hesitation in saying that if money thus employed by the states, may be taxed by the nation, money so employed by the nation, within the states, may be taxed by them. And hence we would infer, that the money employed by either sovereign, within the sphere of *96 the other, in banking or any gainful pursuit, looses its character of revenue, is no longer tax, is money, and may be taxed by the sovereign within whose circle it is thus employed. We think it obvious, that all subjects of taxation not surrendered by the states to the nation exclusively, may be taxed by both concurrently; that neither can withdraw any of those subjects from taxation by the other; that either can pretermit or select such of the subjects aforesaid, as it may choose, and tax them at discretion; that neither can enjoin or obstruct the other in the exercise of that discretion. The power of obstructing or enjoining, implies superiority on the part of the enjoining, and subordination on the part of the enjoined. But a subordinate sovereign cannot exist even in idea—it is a contradiction in terms: If the energies of the supreme power of a state, can be arrested by any judicial officer of the nation; if the taxing power of the states can be thus arrested, then are the sentiments which have been entertained in relation to the sovereignty of the states, erroneous and illusory—the states may be subjects—they cannot be agents. While they subserve the views or the wishes of the national government, they may solace themselves with the belief, that their agency is sovereign: But when they contravene those views or wishes, they may be awakened from the flattering delusion of conscious sovereignty, and reduced to the state of degraded vassals, by a writ of prohibition or injunction, awarded by any judicial agent of the nation; and this too, in relation to every taxing effort which they may attempt. For if they may be enjoined from collecting tax on money, they may, in like manner and upon the same principle, be restrained from collecting taxes upon lands, houses, and other valuable property, under the pretext that those subjects are taxable by the nation, and will not bear the tax exacted by the nation, in addition to that about to be collected by the states.
Neither the national or state gov’mnt can tax a corporation legally established by either, though they may tax the funds of such corporation found within their boundary.
That neither the states or the nation can tax a corporation lawfully created by the other, is a position too obviously clear to require illustration: For we must still insist that they are each sovereign, as to all the subjects upon which they can respectively act. Yet the nation either did not perceive, or perceiving, totally disregarded this obvious position, when she taxed the charters of incorporation granted by the states to banking companies. A clear distinction certainly exists between the charter of a bank, and the money *97 in the vaults of that bank—between the corporate agent and the subjects upon which it acts. By the charter, a corporate power is conferred; money, and other property, to a defined and limited extent, are the subjects upon which the corporate power acts. The acting power, if it be legitimate, is a portion, of sovereignty and cannot be taxed; but the subjects acted upon are not, by reason of their subjection to corporate action, of that character, and thereby withdrawn from taxation. They may nevertheless be taxed by the sovereign whose subjects they are—legitimate corporate power can be taxed by the sovereign alone who grants it. The corporate power displayed in the post-office department might be taxed by the nation, for she granted it, and the grant was legitimate; the states cannot tax it; but the horses, carriages, &c. employed by the undertaker in the carriage of the mail, may be taxed by the state in which the undertaker resides, and so employs them; and the undertaker or carrier would be alike subject to a poll tax with the other citizens of the state in which he might reside. The patents granted by the nation to the authors or inventors of new and useful discoveries, cannot be taxed by the state; but the fabrics erected by the patentees, or their vendees, thereunder or pursuant thereto, may be justly taxed by the state in which they are erected. Neither the judicial process of the courts of the United States, nor the commission of the judge who forms the court, can be taxed by the states; but the judge, and the parties, and the witnesses, who are the subjects of the process and the commission, may be taxed by the state in which they reside. The process and the commission are mediums of sovereign agency—indicia of their sovereign power employed pro hac vice—are identified with the sovereign, and like sovereignty are exempt from taxation. The paper and the parchment are just subjects of taxation, but they exist no longer, they are lost in the process and the commission: So money is lost in tax or revenue. It does not, to be sure, cease to be money when it becomes revenue, more than the paper and parchment cease to exist as such when they become commissions and process; but like those articles it is ennobled in its employment by, and identification with, the sovereign, whose inviolability it enjoys, while the connexion imported by the terms tax or revenue exists.
Being of opinion that the stock of the office of discount and deposit located by the bank of the United States at *98 Lexington within this state, is liable (upon the hypotheses that the charter of that institution is lawful) to be taxed by the state, it is next to be enquired whether the law imposing the tax thereon is valid or void. That act is alledged to be void because it imposes a tax upon the property of citizens of the United States and others, not within the limits of the sovereignty of the state. It cannot surely be contended that the property within this state, of persons not resident therein, cannot be taxed by the state. That property is protected by the government within which it may be permitted to exist, and that it is liable to the government for that protection, and that the latter, in the exaction of an equivalent therefor, may, at its option, address itself to the property or its proprietor, seems to be a political principle of axiomatic clearness; one upon which all governments have acted. The power of acting in rem is inherent in sovereignty, one without which it could not do—it is necessary to justice even in judicial proceedings, as well in relation to the jurisdiction of courts, as to their adjudication. And the action in rem is reconciled to the principle that intelligence and responsibility are inseparable, by a fiction, which like other legal and political fictions, supplies the place of reality and cannot be controverted. The proprietor is supposed to be addressed and notified in and through the address to his property. “Where a man’s treasure is, there will his heart be also.” Property needs, from its very nature, as well the care of its proprietor, as the protection of the government in which it is. It cannot be without the latter, and a just estimate of human nature, forbids the presumption that it is destitute of the former. There is therefore nothing in that objection.
It is alledged as a further objection to this statute, that it imposes upon the officers of that institution heavy penalties for the faithful discharge of their official duties. They are not officers of the government of the nation. They are agents of the stockholders, and are citizens of this state. The penalty inflicted by the law is not for the discharge of official duty, but for the violation of that primary duty which as citizens they owe to their government. If the money in the vaults of that office, and if not only that but the office itself was, as we have supposed, liable to be taxed by the state, it was the duty of the agents of that office to have paid the tax, and in failing to do so, they violated not only their duty to the state, but to the stockholders, who must *99 be presumed, when they bought the stock, to have assumed to pay whatever tax might accrue thereon; for all property is bought, held and transferred, subject to the laws of the sovereign within whose limits it is. We cannot think there is any thing in this objection.
Tho’ the law establishing the bank of the U. S. be thought unconstitutional, yet the state courts are bound by the contrary opinion of the supreme court of the nation.
It is further objected that the penalty inflicted by this law is in violation of the 15th section of the bill of rights in the state constitution, which provides “that excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted.” The objection rests, it is supposed, upon the intermediate clause of that humane provision. No definite criterion is furnished by the constitution or bill of rights by which to ascertain what fine would or would not be excessive within the provision above quoted.
The fine imposed should bear a just proportion to the offence committed, the situation, circumstances and character of the offender. That proportion must be ascertained by the sound discretion of the court: a flagrant transcension by the legislature in fixing the fine of that just relative proportion between offence and fine, would be denominated excessive: But the transcension by the legislature should be flagrantly outrageous, to authorise the judge to pronounce the fine excessive, and vacate the legislative act. The fine in this case is $10,000. The tax exacted by the legislature was $5,000. The offence was a failure to pay the tax. The penalty imposed by the failure is double the amount of the duty required. We cannot say it is excessive. Its amount seems to have been fixed by a criterion of great antiquity, in all monied matters, of private as well as public character.
We are therefore unanimously of the opinion that the law establishing the office of discount within this state is unconstitutional, and that the state has, on that account, a right to tax it. The chief justice is of the opinion that the capital stock of that office, upon the supposition that its charter is legitimate, cannot be taxed by the state. Judges Owsley and Rowan are of opinion that the state may tax its capital stock whether its charter be legitimate or not. The chief justice and judge Owsley are of opinion that the decision of the supreme court of the nation, in the case of M’Cullock and the state of Maryland, is decisive of the question in this case, and binding upon this court. To preserve an uniformity in the operation of the constitution and laws of the United States in every part of the na *100 tion, it is essential that there should be vested in one tribunal the power of ultimately deciding all questions involving their validity or effect, and understanding the supreme court to be vested with that power, and that it has, under the constitution and laws of the United States, appellate jurisdiction in this case, they conceive themselves concluded by its decision, and therefore affirm the judgment of the court below; from which affirmance judge Rowan dissents. He reverences that exalted tribunal and respects its opinions: With the chief justice who penned the opinion in the case alluded to, he has the pleasure of a personal acquaintance: he is longe omnium maximus, sed etiam Jupiter aliquando nutat. That tribunal, and even he, may have erred. J. Rowan would, if his brethren had united with him, have reversed the judgment of the court below, and thereby afforded to the appellate court of the nation an opportunity of reconsidering this very important question. He is unwilling to surrender any portion of the sovereign power of his state upon the first summons. Indeed he is not prepared to say that he should feel himself bound by the repeated decisions of that tribunal to make the surrender. If the nation can, through the agency of congress, usurp the sovereign power of the states, and by its judiciary affirm the usurpation, the states, it would seem to him, ought to be indulged in the remnant privilege of withholding their consent, and thereby indicating that they had still some little regard for the sovereignty of which they were thus disrobed. A prompt acquiescence on their part would seem to invite the nation to repeat and extend its encroachments to the utter annihilation of their sovereignties—but he cannot believe that they are under any obligation to become accessaries to their own destruction; for he insists that the principles asserted in that decision may be extended to the entire prostration of state power; and therefore protests against its binding influence upon this court. It maybe said that an acquiescence in the decisions of the supreme court of the nation, conduces to uniformity of decision and promotes the harmony of the union. That the binding force of the opinions of the appellate tribunal of the nation upon that of the state, in cases like the present, is to be deduced from those beneficial results. He acknowledges the mighty influence which considerations of that sort should have upon the tribunals of both the powers: but he denies that it should actuate either to surrender to the other any essen *101 tial part of the sovereignty of the government whose functionary it is, and with whose power it has been intrusted. He thinks it cannot be surrendered by either to the other—nor can either consent to the diminution or demolition of any of the essential, vital functions of its government. The taxing power in the sovereign is, in political economy, analagous to the vital fluid in the economy of nature, and is a substance too precious to be so disposed of. It may be said that if a confliction between the state and national governments be continued by the protracted resistance of the judiciary of the former to encroachments of the latter, the consequences may be serious and unpleasant. He replies, let the nation see to that, and retrace its steps. The worst that can happen to the state, in the event of protracted resistance, is, the loss of its sovereignty; and if that is to happen, let it be deferred as long as possible, and be produced by any other than its own agency—let it be wrested from the state, not surrendered by its functionaries. He concludes his dissent with an expression of the diffidence with which it is made; a diffidence not resulting from any view of the subject which he has been able to take, but from a very high respect for, and confidence in, the judgment and legal attainments of his brethren.