JOSEPH H. FORNAROTTO ET AL., PROSECUTORS, v. BOARD OF PUBLIC UTILITY COMMISSIONERS OF NEW JERSEY, DEFENDANT.

Argued October 3, 1928—Decided October 22, 1928.

Before Justices MINTURN, BLACK and CAMPBELL.

For the prosecutors, *Osborne, Cornish & Scheck.*

For the defendant, *William H. Speer.*

The opinion of the court was delivered by

MINTURN, J. The application in this case is for a writ of *certiorari* to review the action of the board of public utility commissioners in refusing to grant a permit to the prosecutors for the operation of buses along a certain route prescribed in the application.

The question presented by the record is entirely one of fact as to whether the evidence before the board and the entire situation before them justified the conclusion reached.

The general power of the board, as well as the policy initiated by the legislation creating it is prescribed in section 24, chapter 195, laws of 1911 (*Pamph. L., p.* 384), as follows:

"No privilege or franchise hereafter granted to any public utility as hereinafter defined, by any political subdivison of the state, shall be valid until approved by said board, such approval to be given when, after hearing, said board determines that such privilege or franchise is necessary and proper for the public convenience and properly conserves the public interest."

This delegation of power by the legislative body to a public board is manifestly based upon the theory that the proposal presented by an applicant in any given case "is necessary and proper for the public convenience and properly conserves the public interest."

The board in this instance after having heard the testimony enunciated the following decision:

"The board, before approving a local consent to operate, must find that the consent is necessary and proper for the public convenience and will properly conserve the public interest. This involves more than the detail of the fare as related to a particular operation. While in a particular case there might be an advantage to a limited number in a rate of fare competitive in its nature, the public interest would not be conserved if the competition would tend to affect adversely a system of charges and transportation it is desirable to maintain. The offer to operate at a lower fare does not alone establish a public necessity and convenience. If this were so, transportation would multiply beyond the point of operation at a reasonable profit, to the detriment of proper maintenance and service. This would not be in the public interest."

This pronouncement evidently provides the *ratio decidendi* of the board in reaching its conclusion, and manifestly is in accord with the section of the statute to which we have referred.

The facts in the case appear to be as follows:

The prosecutors were operating a bus line in competition with the Public Service Company over the route designated in the proposal. The Public Service Company had been operating on this line for a long time prior to the operation of the bus line. The prosecutors operate auto buses from the Hudson tube station in Newark by way of South Orange avenue to the Newark City-South Orange village line under the supervision and regulations of the defendant in virtue of chapter 195 of the laws of 1911. They have been operating for many years, originally as independent operators, possessing a total of twenty-eight permits, of which eleven are owned by independent operators. The Public Service Company have purchased from the independent operators seventeen permits.

In addition to the South Orange avenue bus line the Devine street line was originated by the Public Service by diverting buses from the South Orange avenue line through the same territory about a block away. Trolley cars of the Public Service operate on South Orange avenue east from the city line at Dover street to points east of the Pennsylvania railroad Market street station, and from Maplewood to the Public Service terminal. The Public Service also operates on South Orange avenue an express bus service duly authorized by the defendant.

South Orange village has no bus service to either Broad and Market streets or to the Hudson and Manhattan tube station. The fare to Newark by trolley and bus is ten cents, five cents to the Newark-South Orange line, and five cents after crossing that line, with no direct service to the Hudson and Manhattan tube station.

It appears from the evidence that five of the eleven buses operated by the prosecutors are idle during a portion of the day under the existing system, and that there is no five-cent fare from the city of Newark to the village centre. The proposed extension would add one mile to the existing line of bus service.

The prosecutor contends that there would be ample service in South Orange territory between Newark and the city line with the Dover street bus service and the trolleys, if the Public Service Company would be compelled to operate in full quota of bus permits continuously and also furnish sufficient trolley cars.

The prosecutors, on September 19th, 1927. applied to the village of South Orange for permission to extend their line from Dover street to the Newark-South Orange city line easterly for a distance of about a mile into South Orange village, along South Orange avenue to the Lackawanna railroad station. This application was granted by the board of trustees of the village on November 7th, 1927, and application was thereafter made to the board of public utility commissioners for the approval of the permits. Testimony was taken before the commission on December 8th and 15th, 1927, and

a´ decision was rendered by that board on February 9th, 1928, dismissing the application for approval. On April 20th, 1928, the prosecutors filed a petition for a rehearing, and testimony was taken thereon before the commission on May 9th and 18th, 1928. A number of witnesses were examined for the prosecutor, and one witness, Arthur T. Warner, general manager in charge of the Public Service Transportation and Railway Company, was examined for that company.

On July 17th, 1928, the application for the approval of the permits into South Orange was again denied.

The contention of the prosecutors upon this application is that there was no evidence whatever before the board to reasonably justify that conclusion. Their contention is that they offer the public a five-cent fare by bus while the public service is willing to furnish trolley service at ten cents or *de luxe* bus service at twenty cents. The effect of a reversal of the action of the public utility commissioners would be that their action in the matter would be vacated and the petition of these prosecutors would be granted.

Under the decisions and the plain reading of the statute already cited the question presented to the board of public utility commissioners was entirely one of fact. This board is entrusted by the legislature with the power of approving any grant or extension to any public utility made by any political subdivision of the state after the same shall have been fully heard, if the board, in the language of the act, determines that "such privilege or franchise is necessary and proper for the public convenience and properly conserves the public interest." Manifestly this delegation of power presents a question of fact for the discretion and determination of the board after hearing the facts in the case. It has been held on numerous occasions by this court that the determination of a question of fact is not necessarily based upon the number of witnesses produced to support the contention advanced, but rather upon the quality, accuracy and credibility of the testimony adduced, the reasonable inferences deducible, and the entire circumstances surrounding the case. *Alexander Dye Works* v. *Roufosse,* 57 *N. J. L.* 700; *Campbell* v. *Delaware*

*and Atlantic Telephone Co.,* 70 *Id.* 195; *Bowell* v. *The Public Service Corporation,* 77 *Id.* 231.

To this must be superadded under the plain provisions of this act the question of public expediency, whether under all the facts in the case the franchise is necessary and proper "in view of the public convenience, and properly conserves the public interest." This manifestly is a question of good judgment for the board to determine upon the evidence, as well as upon their knowledge of the situation presented by the existing conditions of public travel, and the general public welfare. The legislature has seen fit to delegate this power to the discretion of this board, and unless it appears that the board has reached its conclusion by a manifest violation of the law or by a clear abuse of the discretion vested in it, it is not within the power of this court to disturb the conclusion thus reached where there is evidence apparent upon which it can be reasonably supported. In this instance the board gave two hearings to the prosecutor, and we must assume reviewed all the evidence in the case in the light of their own knowledge of the exigencies and demands of the public situation. This conclusion is supported by the opinion of the learned Chancellor in the case of *McCran* v. *The Public Service Railway Co.,* 95 *N. J. Eq.* 22, where, after an exhaustive consideration of all the equities and facts in the case, he refused to order the Public Service Corporation to continue operating its lines under conditions which might mean serious financial embarrassment to that company. The Public Service Corporation we must observe is a *quasi*-public corporation and has been organized for many years to practically carry on the work of public transportation as a substitute or a subsidiary for direct public service by the state; and the *ratio decidendi* adopted by the Chancellor in the case referred to indicates that the court will not lightly undertake to render that service abortive where a *bona fide* effort by the company is being made to comply with the public duty, imposed upon it by its charter and the general law. In the case referred to the Chancellor's decision resulted in an agreement between the public utility board and the Public Service Company,

involving a system of zoning and the retention of the five-cent fare as well as a provision which resulted in providing electric transportation for the state. Upon this basis the five-cent fare provision was established. This is substantiated by the testimony of Mr. Warner where he is asked the question:

"*Q*. And that is the fare limit approved by the board of public utility commissioners when the so-called zoning system was put into effect, is it not?

"*A*. Yes, sir; that was the point fixed on October 1st, 1923, at the time when the Newark city line was fixed as the limit of the five-cent area.

"*Q*. That makes the fare five cents within the city of Newark and five cents beyond?

"*A*. Yes, sir."

In view of that situation the language of the public utility board (page 193) is comprehensive and luminous: "To create a competitive field in the territory under consideration as proposed would tend to adversely affect the whole scheme of the basic five-cent fare which is now in effect on the street railway and bus lines in the territory in which the public service operates. The disadvantage of this to the larger public served would more than counter-balance any local advantage resulting from the extension of the bus operation proposed."

In rendering its decision the board of utility commissioners considered these matters *seriatim,* including the need for additional transportation and the public interest generally, which would be subserved by a continuance of the present five-cent fare system; and the larger question was whether it would be in the public interest under the circumstances related to grant the consent applied for, keeping in mind at all times that when the legislature used the words "the public interest" the intention was to connote not only the local situation but the general effect of such action upon the entire body politic served by the corporation. It must be manifest that the prime purpose of legislative action of this character is to serve the body politic as an entirety, or in the language of the act "the public interest" as contradistinguished from

legislation of a peculiar local character limited only to the necessities of a circumscribed territorial locality, unless the intention be otherwise clearly expressed in the enactment. Such not only is the presumptive legislative purpose but our constitutional amendments concerning special municipal legislation emphasize such legislative intent. This is emphasized by the board (page 193) where it observes: "The board before approving a local consent to operate must find that the consent properly conserves the public interest. This involves more than the detail of the fare as related to a particular operation. While in a particular case there might be an advantage to a limited number in a rate of fare competitive in its nature, the public interest would not be conserved if the competition would tend to affect adversely a system of charges and transportation it is desirable to maintain. The offer to operate at a lower fare does not alone establish public necessity and convenience. If this were so transportation would multiply beyond the point of operation at a reasonable profit to the detriment of proper maintenance and service. This would not be in the public interest."

In this statement of the intent of this legislation we concur, since it must be observed that the Public Service Company was operating with legislative authorization trolley cars over the route shown on the map for a period of time long anterior to the time during which the bus line entered into competition therewith (keeping in mind also that the permits sought to be approved are intended to extend the service of the prosecutors and competition for one mile further than the Public Service Company now operates). The Public Service Company at present operates its trolleys several miles beyond the limits of the extension sought to be obtained by the bus company, and thereby renders service to a large tract of territory, which service peradventure might be seriously affected, disjointed, or materially impaired if the present application were approved. It is also to be obseved that it is within the power of the public utility board at any time when the public necessity demands it, upon proper representation to that board, to require the Public Service Company to operate ad-

ditional cars and buses for the service of the public in this and other territory.

"The public" in this sense must be construed to be not only the immediate local public of the vicinity affected by the proposed application, but the larger public without regard to territorial limitations, whose interests must also be considered and conserved in making any change which in its results would be detrimental to the entire system of continued public transportation as it is now maintained. This obligation of the board of public utility commissioners is made manifest by the language used in the case of *Motor Transport Co.* v. *Board of Public Utility Commissioners,* 104 *N. J. L.* 234, where it is observed that the duty of the board is not limited to a consideration of the conveniences of the *locus in quo,* but also extends so as to "protect from unreasonable and destructive competition existing facilities which are actually serving the public, so that the public may continue to have the benefit of such service."

The test in a case of this character manifestly is not limited, to the rate of fare proposed to be charged, but to those considerations of general public advantage and convenience which might be disrupted if not entirely disestablished to the public detriment were the existing status disorganized or discontinued.

In such a situation, where we find evidence which will support the finding of the board from the various aspects of the case as required by the legislation under which the board is organized, we cannot even upon a mere variance of opinion overturn that position upon a theory based entirely upon a financial status which will affect only the immediate locality in controversy as contradistinguished in the language of the act from the general "public interest." Such was the reason adopted by the court in the case of *The Plainfield Union Water Co.* v. *The Board of Public Utility Commissioners,* 140 *Atl. Rep.* 785; 6 *N. J. Mis. R.* 267.

Our conclusion, therefore, is that where there is evidence before the board, as there is in this instance, to justify their action and to reasonably support the same, in view not only

of the direct evidence before it but in view of the entire situation of the case under the legislation which has committed the determination of these questions to the board, this court will not disturb their adjudication. We find from the evidence in the case as well as from the general public policy indicated by the legislation under consideration, delegating this power of consideration for the public interest to the board, that that body was within its powers in reaching the conclusion which it has enunciated.

The result is that the rule to show cause under consideration should be discharged.