## MULCAHY et al. v. PUBLIC SERVICE COMMISSION et al.

No. 6282.  Decided September 26, 1941.  (117 P. 2d 298.)
Rehearing Denied February 25, 1942.

See 34 C. J. Judgment, sec. 1171; 30 Am. Jur., 909.

*S. J. Quinney, Irvine, Skeen, Thurman & Miner, Geo. H. Smith, R. B. Porter,* and *W. Hal Farr,* all of Salt Lake City, and *J. A. Howell,* of Ogden, for plaintiffs.

*J. Allan Crockett,* of Salt Lake City, *Joseph Chez,* Atty. Gen., *Rulon S. Howells,* Deputy Atty. Gen., and *Geo. H. Lowe* and *Ira A. Huggins,* both of Ogden, for defendants.

LARSON, Justice.

A statutory proceeding for review by this court of the proceedings and orders of the Public Service Commission of Utah granting to the Fuller-Toponce Truck Company a certificate of convenience and necessity to operate as a common motor carrier of property between Salt Lake City and Logan, Utah. The plaintiffs, railroad corporations, operating through the same territory protested the application of the Fuller-Toponce Company, and bring the matter here for review. The Union Pacific Railroad Company operates an interstate rail transportation system, whose line serves in a general way much of the territory involved in the application of the Fuller-Toponce Company. The Bamberger Railroad Company and the Bamberger Transportation Company, an affiliate, operate motor trucks between Salt Lake City and Ogden as common carriers of property. The Utah Idaho Central Railroad Company, and its successor, the Utah Idaho Central Railroad Corporation, operate an electric railroad between Ogden, Utah and Preston, Idaho. The Bamberger System and the Utah Idaho Central System have an integrated service through the territory from Salt Lake City to Logan. Hereafter the applicant for the certificate,

the Fuller-Toponce Truck Company, will be referred to as the Truck Company, and the protestants, plaintiffs here, will be referred to as the Railroads. The Truck Company began operations as a contract motor carrier between Salt Lake City and Ogden and points in Box Elder and Cache Counties, and in the State of Idaho. In 1936 it applied for a certificate of convenience and necessity to serve as a common motor carrier over substantially the same territory included in the present application. The Public Service Commission granted the application in 1936, and then upon rehearing in 1937 denied the major portion of the request, but granted a certificate to operate as a common carrier between Salt Lake City and Ogden on the one end, and Perry, Mantua, and College Ward in Cache County on the other end.

The order recited that should the Truck Company appeal from the order modifying the certificate previously issued to it, the effective date of the modification order was to be stayed until after the court rendered its decision on review. The Truck Company therefore operated as a common carrier over the territory involved in the 1936 application and certificate until the decision of this court affirming the Commission's action modifying the certificate was rendered, December 5, 1939. *Fuller-Toponce Truck Company* v. *Public Service Commission*, 99 Utah 28, 96 P. 2d 722. While that matter was pending in this court, on October 13, 1939, substantially eight weeks before the court rendered its opinion, the Truck Company filed with the Commission a new application for a certificate of convenience and necessity as a common motor carrier, covering with a few minor additions the same territory involved in the 1936 application. Upon hearing the Commission found convenience and necessity for the motor carrier service and granted to the Truck Company a certificate to operate as applied for, with the exceptions that it denied the principal parts of the additions to the former application of 1936, that is, it now granted a certificate to render substantially the same service it had

denied on the prior application of 1936. The Railroads seek review by this court.

It is urged that the Commission did not regularly pursue its authority, and that it acted arbitrarily in granting the certificate and issuing its order therefor because:

(a)  There is no evidence showing or tending to show convenience and necessity.

(b)  The uncontradicted evidence shows the granting of the certificate will be detrimental to the best interests of the people and localities to be served.

(c)  There is no evidence of any change in conditions since the hearing on and denial of the 1936 application, and therefore that determination is res adjudicata of the issue here involved.

(d)  That if more or new transportation service is needed, the Commission is by law bound to give existing carriers an opportunity to render the service before permitting a new carrier or competitor to enter the field.

(e)  The Commission erroneously interpreted and applied the law in holding it was "required by law to grant this application if it found that the granting is not detrimental to the best interests of the public," whereas it is "only authorized to grant the application when it finds the granting thereof is to the best interests of the public."

(f)  The Commission exceeded its authority in holding that because the Truck Company had been operating for three years under a certificate the Commission had issued and vacating on rehearing, such operation and business placed the applicant in an advantageous position over the Railroads on the hearing before the Commission.

Our power of review is limited to questions as to whether the Commission in the exercise of its authority proceeded in the manner required by law, and whether the findings of the Commission are justified by the evidence. Section 76-6-16, R. S. U. 1933. 57 C. J. 82. From this point of view we have read and examined the record, and given careful

consideration to the splendid and elaborate briefs of counsel. We note the points urged by plaintiffs.

Is the finding that public convenience and necessity will best be subserved by permitting the Truck Company to operate under the certificate as awarded to it, justified by the evidence? It is not required that the facts found by the Commission be conclusively established, nor even that they be shown by a preponderance of the evidence. If there is in the record competent evidence from which a reasonable mind could believe or conclude that a certain fact existed, a finding of such fact finds justification in the evidence, and we can not disturb it. *Fuller-Toponce Company* v. *Public Service Commission,* 99 Utah 28, 96 P. 2d 722. It has been repeatedly held that a review of the Commission's order is limited to a determination of whether the Commission acted within the scope of its authority, whether the order has any substantial foundation in the evidence, and whether any substantial right has been infringed by such order. We are reviewing the action of an executive body, executing and carrying out the provisions of the law, the mandates of the statute, and ever since *Marbury* v. *Madison,* 1 Cranch 137, 2 L. Ed. 60, it has been recognized that one department of the government cannot control the judgment or official acts of another department, acting within its proper sphere of governmental power, within the scope of its authority. Issuing a certificate of convenience and necessity is an act of the executive department of state government, and when done pursuant to law is not subject to judicial annulment. But an act which is not within the scope and duty of executive power, even though and when attempted or performed by an executive body, may be annulled or prohibited by the judicial branch. For the executive bodies, like the individual persons making up the sovereign people can lawfully exercise only the rights and powers recognized by law as existing in them. There is vested in the Public Service Commission, by the law of its creation and existence, the right and power to issue certificates of convenience and ne-

cessity for motor transport service as common carriers when it "finds from the evidence that the public convenience and necessity require the proposed service." Chapter 65, Section 6, Laws of Utah 1935. What policy should be pursued, or what conclusions should be drawn from disputed facts is not a law question for the judiciary to decide. Such questions must be determined by the person or body whose action depends upon the determination thereof. But the question as to whether there is competent evidence to justify the action taken, or to be taken, is a legal question, because the official body is authorized to act only according to law, that is, upon competent evidence. An attempt therefore to act upon a matter without any competent evidence to sustain it is not done according to law, and therefore is not done in the pursuit of lawful authority.

It is argued that the evidence does not justify a finding of *public* convenience and necessity, but at most only the convenience of individual shippers. There can be no fast rule or clear line of demarcation between the convenience and necessity of individuals and the convenience and necessity of the public, because after all the public is made up of a collection of individuals. But a thing may be a convenience or a necessity for many individuals and yet not be a public convenience or necessity. The "convenience" and "necessity" required to support an application for a certificate are those of the public, not those of individuals. *O'-Keefe* v. *Chicago Rys. Co.*, 354 Ill. 645, 188 N. E. 815. "Necessity" and "convenience" are not to be construed as synonymous. Convenience is much broader and more inclusive than necessity, but effect must be given to both. Necessity means reasonably necessary and not absolutely imperative. *Commonwealth* v. *Morrison*, 9 Ky. 75, 2 A. K. Marsh 75; *Wisconsin Tel. Co.* v. *Railroad Comm.*, 162 Wis. 383, 156 N. W. 614, L. R. A. 1916E 748. It does not mean "necessary" in the ordinary sense of the term. The convenience of the public must not be circumscribed by holding the term "necessity" to mean an essential requisite. It means

a public need without which the public, people generally of the community, would be inconvenienced or handicapped in the pursuit of business or wholesome pleasure, or both. It is the denial to people generally of the community, to their detriment of that which is enjoyed by other people generally, similarly situated. It is a definite need of the general public for such service where no reasonably adequate service exists. It is necessary if it appears reasonably requisite, is suited to and tends to promote the accommodation of the public. *North Bend Stage Line* v. *Dept. of Public Works,* 162 Wash. 46, 297 P. 780; *Southern Kansas Stage Lines Co.* v. *Public Service Comm.,* 135 Kan. 657, 11 P. 2d 985; *Missouri, Kansas & Oklahoma Coach Lines* v. *State,* 183 Okl. 278, 81 P. 2d 660; *Oklahoma Union Ry. Co.* v. *State,* 146 Okl. 92, 293 P. 537; *Abbott* v. *Public Utilities Comm.,* 48 R. I. 196, 136 A. 490; *Canton-East Liverpool Coach Co.* v. *Public Utilities Comm. of Ohio,* 123 Ohio St. 127, 174 N. E. 244. The statute should be so construed and applied as to encourage rather than retard mechanical and other improvements in appliances and in the quality of the service rendered the public (*North Bend Stage Line* v. *Denney,* 153 Wash. 439, 279 P. 752) ; and should look to the future as well as the present, providing not only for present urgent need, but such as may reasonably be anticipated from the probable growth of population, industry and community development (*Campbell* v. *Illinois Commerce Comm.,* 334 Ill. 293, 165 N. E. 790) ; to the end that both the quality and quantity of that which is offered to the public for its necessity, convenience and pleasure may be improved and increased, and community development and life enriched and encouraged. *North Bend Stage Line* v. *Dept. of Public Works,* supra. Any service or improvement which is desirable for the public welfare and highly important to the public convenience may properly be regarded as necessary.

"If it is of sufficient importance to warrant the expense of making it, it is a public necessity. * * * A thing which is expedient

is a necessity. \* \* \* A strong or urgent reason why a thing should be done creates a necessity for doing it."

*San Diego & Coronado Ferry Co.* v. *Railroad Comm. of California,* 210 Cal. 504, 292 P. 640, 643; *Chicago & N. W. Ry. Co.* v. *Verschingel,* 197 Minn. 580, 268 N. W. 2, 709; and public inconvenience may be so great as to amount to a necessity. *Wabash, C. & W. Ry. Co.* v. *Commerce Comm.,* 309 Ill. 412, 141 N. E. 212. The statute should be construed to mean a reasonable necessity depending upon the circumstances of the particular case. *State ex rel. Kent Lumber* v. *Superior Court,* 46 Wash. 516, 90 P. 663.

When a utility desires to enter a new field or to render a new or different service, it must, as a condition to receiving a certificate to so perform, show that service sought to be given is one of "public convenience and necessity." *Fuller-Toponce Truck Co.* v. *Public Service Comm. of Utah,* 99 Utah 28, 96 P. 2d 722, 724. And in determining whether or not the convenience and necessity of the public will be best subserved by the proposed service, the needs and welfare of the people of the territory or community affected should be considered as a whole. *Fornarotto* v. *Board of Public Utility Com'rs,* 105 N. J. L. 28, 143 A. 450. The mere matter of convenience to certain shippers does not establish public necessity or convenience. If existing utilities are rendering adequate service ordinarily a certificate will not be granted putting a new competitor in the field. But a service is not necessarily adequate because the community can "get by," can conduct its business without further or additional service. To be adequate the services must meet the requirements of the public's convenience and necessities in such a way that the needs, growth, and welfare of the community are reasonably met and supplied. To be adequate they must safeguard the people generally from appreciable inconvenience in the pursuit of their business, their wholesome pleasure, and their opportunities for growth and development. And if a new or enlarged service will enhance the public welfare, increase its opportunities, or stimulate its

economic, social, intellectual or spiritual life to the extent that the patronage received will justify the expense of rendering it, the old service is not adequate.

The Commission heard all the evidence, examined the documents and exhibits, not as a judicial tribunal deciding questions of guilt or investigating claimed infringement of legal rights and applying remedies, but as an executive determining a course of public conduct and needs. It found that "public convenience and necessity" required or justified a new, or enlarged or different or additional transportation system for the transportation of property in less than carload lots. It is not the province of the reviewing tribunal to weigh the evidence offered as shown by the record. Its province is to determine if there is any evidence to justify a finding of convenience and necessity. The California Court in *Oro Electric Corp.* v. *Railroad Comm.*, 169 Cal. 466, 147 P. 118, 119, said:

"Here the Commission found the ultimate fact that the public convenience and necessity did not require the exercise of the privileges in controversy, and neither the sufficiency of the evidence, nor the soundness of the reasoning, upon which that finding was based, can be considered on this proceeding."

And as was so aptly said in the recent case of *Fuller-Toponce Truck Company* v. *Public Service Commission et al.*, supra:

"Whatever may be our opinion as to whether the commission found well or wisely, or whether our conclusions on the evidence would have been the same, we are bound by the findings, when there is evidence to support them."

There is evidence in the record to support or justify the finding that public convenience and necessity require some new and additional transportation service. This disposes of plaintiff's points (a) and (b).

(c) Is the action of the Commission in 1937, denying to the Truck Company a certificate of convenience and necessity to operate in the same territory and in the same way

involved in this certificate, res adjudicata and binding upon the Commission at this time? The Railroads argue that since the Commission denied the Truck Company's application in 1937 because it found the evidence did not show public convenience and necessity, such finding is conclusive and binding on all parties for all time, unless it is shown that conditions have changed from what they were at the time of the former hearing. Pursuant to this position they offered in evidence before the Commission a transcript of the evidence and proceedings upon the former application to show that conditions then testified to and described were substantially the same as those described upon this hearing. The Commission rejected the offer. Assuming for the discussion of this point that there was no change in conditions since the order in 1937 should the rule of res adjudicata be applied to preclude other action on the present application? The doctrine of res adjudicata is plain and intelligible and amounts simply to this: that a cause of action, once finally determined, without appeal, between the parties on the merits, by a competent tribunal, cannot afterwards be litigated by a new proceeding either before the same or any other tribunal. And the estoppel arising from the findings in a previous suit between the same parties goes to *the decision of the legal rights* of the parties on a state of facts common to both suits, although the causes of action may be different. *Southern Minnesota Railway Extension Co.* v. *St. Paul & S. C. R. Co.*, 8 Cir., 55 F. 690. The doctrine of res adjudicata applies only to judicial decisions, (*Prentis* v. *Atlantic Coast Line Co.*, 211 U. S. 210, 29 S. Ct. 67, 53 L. Ed. 150); and not to legislative, executive, or ministerial determinations. But the question is not determined by the forum or name of the body rendering the decision, but by the nature, purpose, and legal effect of the decision. It need not be rendered by a court if it is judicial in its legal consequence and effects.

"The rule which forbids the reopening of a matter once *judicially determined* by competent authority applies as well to the judicial and

quasi-judicial acts of public, executive, or administrative officers and boards acting within their jurisdiction as to the judgments of courts having general judicial powers." (Italics added.) 34 C. J. Page 878.

It is often difficult to draw a line between judicial action which concludes parties and privies unless reversed, vacated or set aside in some direct proceeding authorized by law, and executive or ministerial action, which if erroneous may be revised by courts in a collateral proceeding. The rule of res adjudicata has been applied to decisions of highway commissions, county boards, tax commissioners, and other like bodies, although not all decisions by those bodies are within the rule. The test is: Was the particular decision judicial in its nature and effect? The measuring rod, the test to be applied in determining this question, is not to be found in the mechanics of the proceeding. The mere fact that hearings are had, evidence taken, and decisions rendered thereon, does not make the decision a judicial one. The proper test is the functional one. The powers and functions of government are either legislative, executive, or judicial. Constitution of Utah, Art. 5, § 1. The legislative function is the enactment of laws, that is, the creation of legal rights, liabilities, and remedies. Generally, they are to govern future conduct. The executive function is to carry into effect, to put into operation and operate, the legislative mandates. It acts to perform the duties, the obligations, imposed upon the public body by law, and to see that the individuals duly render and perform the obligations and duties which the law has said they owe to the public body or the government. The judicial function is to define the legal rights and obligations conferred or imposed by law upon the community to the individual, the individual to the community, or one individual to another individual; and to apply the remedy when one such party has infringed the right of, or failed in his or its obligation to the other. The legislative function operates at the will and pleasure of the legislative body, on any matter or at any time it may choose, limited only by the mandates of the Constitution.

It is self-motivating. The executive function operates continuously from the effective date of legal enactments, to the extent of all duties imposed upon it by the rights and duties created by law, in which rights or duties the community or public body is a party. The judicial function is not self-activating. It comes into operation only on request of the community or of an individual, when such party thinks another has interfered with his rights, or failed in obligations to him. The judicial function only plays a role when there is an apparent controversy over the extent or infringement of legal rights, and appeal to the judiciary is made by one party to define and fix the legal rights of the parties with respect to the matter in controversy. It is not concerned with determination of policy nor with the creation or termination of legal rights. It determines whether or not a claimed legal right exists; whether one has been infringed or denied; and if so, applies a remedy for the protection or enforcement of the right. Decisions which constitute an exercise of the judicial function and which, if not appealed, reversed, vacated or set aside become a final determination, are res adjudicata of the issues or legal controversy thereby decided. Any decision which is not an exercise of the judicial function or one which does not purport to settle and conclude a legal controversy is not res adjudicata, final and conclusive of the rights or issues therein involved or thereby decided.

Was the order of the Commission entered in 1937, denying to the Truck Company a certificate of convenience and necessity, an exercise of the judicial function, and if so, did it purport to finally determine, settle and conclude a legal controversy involved therein? In other words, was there a legal controversy, that is, a claim that a legal right had been or was being infringed or denied; or a claim that a delict in a legal obligation had occurred, or was about to occur; or was there a request for the application of a legal remedy to protect such right, or to prevent the occurrence or continuance of such wrong, or to compensate for its occurrence?

If not, the order would not be made as an exercise of the judicial function or power, and therefore could not be res adjudicata.

Under the provisions of Section 6, Chapter 65, Laws of Utah 1935, it is evident that no one has an inherent right to engage in the business of a common motor carrier within this state. The statute expressly denies such right, and provides the only method by which such right may be obtained, It reads:

Section 6, Chapter 65, Laws of Utah 1935:

"It shall be unlawful for any common motor carrier to operate as a carrier in intrastate commerce within this state without first having obtained from the commission a certificate of convenience and necessity. * * * If the commission finds from the evidence that the public convenience and necessity require the proposed service or any part thereof it may issue the certificate as prayed, for * * * Before granting a certificate to a common motor carrier, the commission shall take into consideration the financial ability of the applicant to properly perform the service sought under the certificate and also the character of the highway over which said common motor carrier proposes to operate and the effect thereon, and upon the traveling public using the same, and also the existing transportation facilities in the territory proposed to be served. If the commission finds that the applicant is financially unable to properly perform the service sought under the certificate, or that the highway over which he proposes to operate is already sufficiently burdened with traffic, or that the granting of the certificate applied for will be detrimental to the best interests of the people of the state of Utah, the commission shall not grant such certificate."

Furthermore the form of application required and made to the Commission for a certificate does not assert or claim a right to engage in the business of a common carrier. It merely requests or seeks a license or privilege of engaging in the business, not as an existing right, but as a prayer for the granting of a privilege. It does not assert or claim that any one has infringed or denied a right applicant has, nor is it predicated or based on any such theory. It is not directed at any one, nor at their conduct. It does not assert

or claim any one has failed in a legal obligation due applicant, or any other person. It does not even make a claim that the railroad had failed in its obligations to the public. It seeks no recompense or relief. It presents no controversy in law.

A protest was filed by the railroads. The file is not before us but the position of the railroads is that the matters there involved were the same as those raised on the present application of 1939. We may therefore assume that the protest in 1937 was similar to that filed to the 1939 application. It denies the necessity for additional common carrier service in the territory; denies the economic feasibility of the project; and alleges that the granting of the certificate will jeopardize the service now being rendered by the railroads; and concludes with an offer by the railroads to perform any new or additional transportation service should such service be found justified by the Commission. There is no claim set forth that the Truck Company had infringed or denied any right the railroads had; or had failed in any obligation to the railroads; nor is there any claim of compensation for, or relief from, any act the truck company had done or was threatening to do. As between these parties there was no legal controversy, no asserted cause of action, so to speak, of one against the other. The whole issue involved, as to each party, was whether or not the public convenience and necessity required or would be better subserved by additional carrier service; and if so who should be permitted to render it.

The inquiry, as advanced and set forth by the truck company and the railroads, was addressed to the discretion of the Commission for its determination of matters pertaining primarily to the needs and conveniences of the public, and not rights theretofore vested in, or obligations theretofore assumed or imposed upon either of the parties before the court in this action, or their privies. If as a result of the investigation the Commission granted any certificate it would be for the relief of the public inconvenience and needs,.

and not for relief from any infringements upon the rights of the party to whom the certificate was granted. It is evident therefore that there was no legal controversy, no controversy at law, to call into operation the exercise of the judicial function or power, and the findings or conclusions made would therefore not be a judicial determination or judgment, and hence not res adjudicata. Furthermore Chapter 6 of Title 76, R. S. U. 1933, provides that all hearings are governed by the provisions of the chapter and the rules of practice and procedure to be adopted by the Commission. There is no provision in the chapter limiting the number of times an application can be made. The Commission rule provides it may not be renewed within one year, thus showing the Commission did not intend a rejection to be final.

Since the order on the 1937 application is not res adjudicata, no point is involved in the refusal to receive in evidence the transcript of evidence of that hearing.

(d) When the Commission found that public convenience and necessity required new or additional motor transportation service in the territory involved, was it as a matter of law required to give the existing carriers, the railroads, the right and opportunity of rendering such service before admitting a new competitor into the field? The regulation of utilities, and the creation of a commission to carry out the provisions of the regulatory act were done in the public interest, and for the purpose of assuring the public an adequate service at reasonable rates. The extent, kind and quality of service is perhaps more fundamental and important in the regulatory setup than is the matter of rates.

The Commission from the first was charged with the duty of controlling and fixing the rules, regulations, practice, equipment, appliances, facilities and services of any public utility and its methods of doing business, and to fix the same by order, (Section 4803, Compiled Laws of Utah 1917) ; and to order new or additional service and facilities found necessary to promote the *security or convenience of*

*the public,* (Section 4804, C. L. U. 1917) ; also to prescribe time schedules and number and character of trains which the commission deems necessary to accommodate and transport the traffic, passengers and freight. Section 4805, C. L. U. 1917. The special session of the Thirteenth Legislature, in October 1919, first required that public utilities before undertaking new or additional service or construction obtain from the commission a certificate "that the *present or future* public convenience and necessity require" the same. The commission was given "power, after hearing, to issue said certificate as prayed for, or to refuse to issue the same, or to issue it" in part, and attach to it such conditions as the public necessity and convenience may require. Chapter 14, Laws of Utah, Special Session 1919. (Italics added.) By the Laws of 1927 for the first time a permit from the commission was required of any and all automobile companies engaged in the business of transporting for hire over the public highways of the state, and specified the matters to be considered in issuing or denying such certificates. Chapter 42, Laws of Utah 1927. This act vested in the commission the authority after hearing to issue or refuse to issue the permit, or to issue it in part. It declares that the reasons for requiring permits, and the right to refuse such permits are two-fold: "for the purpose of protecting the public highways of the State of Utah and safeguarding the use of the same by the traveling public." This act was carried forward with changes in language and amplification and specifications into the Laws of Utah 1935, Chapter 65, under which these proceedings were brought. It provides in Section 6 thereof that no common motor carrier may operate without a permit; provides for application to the commission for permits; and for notices and hearing thereon. While evidence pertinent to any question involved in the application may be presented on the hearing, the commission's determinations would proceed as follows: Does the public convenience and necessity require further, new or additional common carrier service in the territory pro-

posed to be served? If not, the application should be denied. If such service is required, should the applicant be permitted to render it? In determining the answer to this question the commission shall consider the following matters: (1) Is the applicant financially able to perform the service? If not, his application must be denied. (2) Will the operations proposed unduly injure the highway over which the operations must be carried on, or unduly interfere with the use of the same by the traveling public? If either phase of this question be answered in the affirmative the application should be denied. (3) Although beneficial to the territory to be served, would the service proposed be detrimental to the people of the state as a whole? If so, the application should be denied. (4) Having found now that the convenience and necessity of the public in the territory proposed to be served require additional service; that such service will not be detrimental to the people of the state as a whole; that applicant is financially able to render the service; that the service will not unduly injure the highway or unduly interfere with the public traveling thereon, the question is: Should such new service be rendered by existing carriers or by the new applicant? This question poses for the commission, not the finding of a factual answer, but the determination of a matter of policy. Which in the opinion of the commission will best subserve the public convenience, necessity and welfare? And in determining this matter the commisssion under the statute may and should take into consideration the existing transportation facilities, their investment, the taxes they pay, the services they have rendered and are now rendering; the need of a continuation of such services; the effect upon such services of a new obligation to serve; the effect upon such services of a new competitor in the transportation field; the effect of a new competitor or carrier upon the economic, industrial, social and intellectual life of the territory, and other matters which may effect the public welfare, and the growth and development of the

life in, and resources of the state. That existing carriers engaged in transportation to and from a certain field or territory, rendering the service it is permitted or ordered to do, reasonably, adequately and efficiently, is not lightly or ruthlessly to be interfered with, or subjected to needless competition, is evident from the provisions of the statute Section 5 of Chapter 65, Laws of Utah 1935, after vesting in the commission the power to regulate and supervise all common motor carriers reads:

"* * * to regulate the facilities, accounts, service and safety of operations of each such common motor carrier, to regulate operating and time schedules so as to meet the needs of any community, and so as to insure adequate transportation service to the territory traversed by such common motor carriers, *and so as to prevent unnecessary duplication of service between these common motor carriers, and between them and the lines of competing steam and electric railroads;* and the commission may require the coordination of the service and schedules of competing common carriers by motor vehicles or electric and steam railroads * * *."

An applicant desiring to enter a new territory, or to enlarge the nature or type of the service he is permitted to render must therefore show that from the standpoint of public convenience and necessity there is a need for such service; that the existing service is not adequate and convenient, and that his operation would eliminate such inadequacy and inconvenience. He must also show that the public welfare would be better subserved if he rendered the service than if the existing carrier were permitted to do so. The paramount consideration is the benefit to the public, the promotion and advancement of its growth and welfare. Yet the interests of the existing certificate holder should be protected so far as that can be done without injury to the public, either to its present welfare or hindering its future growth, development, and advancement. *Corporation Comm.* v. *Pacific Greyhound Lines,* 54 Ariz. 159, 94 P. 2d 443; *Chicago R. R. Co.* v. *Commerce Comm.,* 336 Ill. 51, 167 N. E. 840. Having given due consideration to those matters

the commission determines whether the existing carriers or a new one should be permitted to render the proposed service. If the commission's determination finds justification in the evidence, it is not a law question and we cannot review or modify it or set it aside. Regardless of what our own views on the matters may be, the determination of the commission on this matter finds support or justification in the evidence. We cannot say it acted arbitrarily or capriciously, and the finding thereon must stand.

(e)    Complaint is made that the commission erroneously interpreted and applied the law in holding it was "required by law to grant this application if it is found that the granting is not detrimental to the best interest of the public." That such statement, made on page 6 of the commission's report, is an erroneous statement of the law cannot be doubted from what has been said above, but it does not follow that the order granting the certificate is void or should be vacated. The Commission was not unmindful of the basis for an allowance of a permit for it says on page 5 of its report:

"In view of the decision of the commission in the former case, we are fully aware that in order to grant the applicant the authority it is seeking, we should find clear and convincing proof which would sustain a firm conviction on our part that the best interests of the public will be served thereby."

Since the commission found the public interest best subserved by granting this permit to the Truck Company and we have held such finding has support and justification in the evidence, and since the grant of the certificate is not predicated upon the erroneous statement of law by the commission quoted above, it must stand. Not every erroneous statement of law by a board or by a court voids its orders. It has that effect only when the order is, or is presumed to be grounded or based upon that principle of law.

(f)    In the commission report is the statement on page 6:

"The fact that the applicant initiated this service gives it a decided advantage over the protestants in any determination which it becomes the responsibility of this commission to make as to whom the right to render such service should be granted."

It is argued that there is no evidence which tends to show such advantage existed. It is not clear from the sentence quoted whether the commission in making the comment were intending the idea that the law required them to give advantage to the truck company; or whether it meant that to its mind the advantage lay with the party who had seen the business opportunity and the need for the service and made the first request to render it; whether it meant that since the Truck Company was already rendering the service, and had built up its trade and business it should be protected in that business if a new certificate were granted. From the report as a whole it is evident the last view was the one intended, and the railroads so argue it. The Truck Company had received a permit in 1936, which the commission had later cancelled on a rehearing. Pending an appeal to this court the commission stayed the effect of its cancellation order and continued the permit in effect. Acting thereunder the Truck Company had built up some business and acquired some good will. The commission evidently felt that since the railroads, even upon this hearing were contesting the need for the added service, although expressing a willingness to render it if the commission found it necessary, the party anxious, able, ready and willing to serve should be protected in the business it had built up with approval of the commission. With regard to such business, the commission evidently felt that the Truck Company was in the position of being the existing utility and therefore had the position of advantage. While one cannot obtain such position by operating without a permit, or under an illegal, void, or cancelled permit, the report of the commission contains a number of findings of fact which offer support or justification for its order independently of the statement of which complaint is made.

In the language we used on the former application (*Fuller-Toponce Truck Company* v. *Public Service Commission,* 99 Utah 28, 96 P. 2d 722, 726) :

"Whatever may be our opinion as to whether the commission found well or wisely, or whether our conclusions on the evidence would have been the same, we are bound by the findings, when there is evidence to support them."

We hold therefore that the order of the Commission be affirmed with costs.

McDONOUGH, J., concurs in the result.

WOLFE, Justice (concurring in part, dissenting in part.)

I regret that I cannot fully concur in the opinion which reveals a careful consideration of the points involved and a clear exposition of the reasoning leading to its conclusions. Having, in connection with the cases of *Tite* v. *Tax Comm.,* 89 Utah 404, 57 P. 2d 734; *Rowell* v. *State Board of Agriculture,* 98 Utah 353, 99 P. 2d 1; *Denver & R. G. W. Ry. Co.* v. *Pub. Service Comm.,* 98 Utah 431, 100 P. 2d 552; made excursions into the nature of administrative agencies, I must issue a warning against denominating such bodies as executive, legislative, or judicial. As stated in the dissenting opinion in the Rowell case, and I think it uncontroversially true, there is much confusion

"by the endeavor to give to administrative performance the distinguishing characteristics of legislative, executive and judicial. The truth is that it is because of the very necessity of departing from the rigiditiy of separation of powers into these three categories that administrative agencies must be established. It is impossible, in the development of a program of a declared policy of regulation, many times, to say where the legislative ends and the executive begins. He indeed is to be congratulated who can pick out the legislative, the executive, and the judicial ingredients of many completed administrative processes. But to do so and label them would be useless labor. They are *administrative* acts which involve, in many cases, an inextricable admixture of all three functions." [98 Utah 353, 99 P. 2d 8.]

To earmark an administrative agency as executive and/or legislative brings one squarely up against Section 1 or Article 5 of the Constitution of Utah on questions of delegation of powers and review. See discussion in the concurring opinion in *Denver & R. G. W. Ry. Co. v. Pub. Service Comm.,* supra.

The legislature can, of course, delegate legislative powers to an agency. It is not the delegation which is prohibited, despite the unfortunate phrases to the contrary. Said Elihu Root:

"The old doctrine forbidding the delegation of legislative power has virtually retired from the field and given up the fight." 41 Rep. Am. Bar Ass'n, 335 at page 368. (1916)

Professor Cheadle in "The Delegation of the Legislative Function" 27 Yale L. J. 892 at 920 said that the only question confronting the courts is, "What is reasonably necessary in view of what the times demand and the end to be accomplished." Says I. L. Sharfman in "The Interstate Commerce Commission: An Appraisal" 46 Yale L. J. 915, (1937):

"Similarly, the concern often expressed over the Commission's infringement upon the separation of powers is grounded more largely in disturbance over appearances than in the menace of realities. That the performance of its numerous tasks involves a marked blending of functions—legislative, executive, and judicial—cannot be gain-said; but this admixture of functions, as in connection with the more traditional forms of administration, manifests itself for the most part in the processes essential to the sound and effective achievement of its primary purposes rather than in the independent exercise of separable types of governmental power. The propriety of performance of executive functions by an administrative arm of the government raises little question; the source of difficulty is generally alleged to lie in the exercise by the same tribunal of both legislative and judicial functions. But as a regulatory tribunal designed to further positive public ends, the *Commission's powers are predominantly legislative in character,* and such judicial functions as it exercises are largely incidental to the proper performance of its legislative duties." (Italics added.)

In 27 Graphic Survey 494 (Oct. 1938), A. H. Feller in "Administrative Justice" tells us:

"Some fifty years or more ago, students of American government could talk easily about a beautiful principle called the separation of powers. * * * Even in those days this neat theoretical division was not a completely accurate description of actual governmental operations; today the separation of powers is hardly more than an inspiration slogan. * * * The consequence has been that ever since the eighties of the last century Congress has been compelled to hand over more and more of the law making job to administrative agencies. The Supreme Court has given this delegation of legislative power its blessing and has asked only that some intelligible standard for the guidance of administrative action be laid down by Congress. * * * Administrative legislation has assumed a bulk and importance easily matching that of Congressional legislation."

And O. Douglas Weeks, in an article appearing in 25 Georgetown L. J. 314, entitled "Legislative Power versus Delegated Legislative Power" writes:

"Beginning with the establishment of the Interstate Commerce Commission in 1887 and the subsequent multiplication of boards of a similar nature in both the federal and state governments, there developed a new type of administrative agency which came to be looked upon as primarily quasi-legislative and quasi-judicial in its functions and to which very broad powers of a legislative character were delegated on the assumption that it was a direct agent of Congress or the State Legislature with respect to these powers."

Cardoza, in his "Growth of the Law" (1924) P. 132, says:

"I have been surprised to see how many partisans the notion of a separation of powers rigid and perpetual—the judges the interpreters, the legislature the creator—is able even in our day to muster at the bar."

And McFarland, in his book entitled "Judicial Control of the Federal Trade Commission and the Interstate Commerce Commission" writes at Pages 5 and 6:

"The time-honored division of the labors of government was the first obstacle to the existence of the Interstate Commerce Commission, and other principles for the legal treatment of modern adminis-

trative agencies are often related to the doctrine of separation of powers. Now, however, the commerce commission is commonly taken as the outstanding example of the eclipse of the doctrine."

And again, in Mr. Justice Holmes dissenting opinion in *Springer* v. *Government of the Philippine Islands*, 1928, 277 U. S. 189, 48 S. Ct. 480, 485, 72 L. Ed. 845, we find the following:

"It is said that the powers of Congress cannot be delegated, yet Congress has established the Interstate Commerce Commission, which does legislative, judicial and executive acts, only softened by a quasi * * *."

Like excerpts could be multiplied indefinitely from the writings of eminent judges and legal scholars. In view of their conclusions, bold indeed is he who in this day still persists in denominating an administrative function as executive or legislative.

It is the failure to provide limits to the powers delegated or guides for the exercise of those powers which may make the law inoperative. But theoretically the legislature cannot give judicial powers to an agency other than a court. But any attempt to pick out the powers given to an administrative agency as judicial, legislative, or executive, would end in futility. The very reason the agency was denominated administrative was to get away from labeling it as executive, judicial or legislative. And if this be said to be a subterfuge to avoid the mandate for the separation of powers, the answer is that modern government could not exist without administrative agencies possessing powers in character legislative, judicial and executive.

If the Public Service Commission were to be so designated, it would fall under the heading of a legislative agency rather than executive. Time was when the legislature by enactment chartered corporations, fixed maximum rates for utilities, etc. Modern conditions forced the legislature to establish an agency to find the facts and establish the rates. See the quotation from Weeks, supra.

"The Public Service Commission is only a representative agency established by the Legislature." *Lusk* v. *Atkinson*, 268 Mo. 109, 186 S. W. 703, 705.

My plea, however, is not to run the hazard of earmarking the agency as either judicial, legislative or executive, for reasons sufficiently intimated above.

The opinion attempts to define a judicial function. It states that

"the judicial function is to define the legal rights and obligations conferred or imposed by law upon the community to the individual, the individual to the community, or one individual to another individual; and to apply the remedy when one such party has infringed the right of, or failed in his or its obligation to the other."

Outside of the word "define," with which I have scant quarrel. I am not prepared to say that such are not judicial functions. But are they entirely court functions? Is it not necessary for most administrative bodies to "define" or determine what the law is before they act upon it? Do not our Bureau of Registration, Insurance Commissioner, and other state administrative agencies "define" the rights of, or laws in respect to professional people, insurance companies, and others with whom the agencies deal, and "define" the obligations imposed by law? True, in many cases, commissions "define" or "construe" the law and in pursuance thereof, and in addition thereto, grant or confer rights and impose obligations themselves. This is one of the differences which, in some cases, distinctly mark an administrative tribunal as different from a court. The Public Service Commission, when it issues a certificate of convenience and necessity, confers a right. That is neither a supervising or regulatory function and not a judicial function. If it must be designated it seems distinctly in the nature of a legislative function. The Industrial Commission really performs a judicial function in determining an employer's obligation to an employee for compensation, soften it with the word "quasi" as we may. Certainly, administra-

tive bodies apply remedies where a right is infringed far more than do courts. Except in equity, divorce, ejectment and a limited type of actions, all the courts can do is to give a judgment which amounts to an authoritative declaration that one party owes a definite amount to another party. On this declaration, properly entered, the administrative step of execution takes place. But the Interstate Commerce Commission, the Federal Trade Commission, and in fact many commissions provide definite remedies in an affirmative form requiring something to be done or cease being done. I am pointing out these matters in support of my plea for the greatest of caution in defining what is executive, legislative and judicial.

As stated in *Tite* v. *State Tax Commission,* supra [89 Utah 404, 57 P. 2d 737], the question of whether the matter is judicial or administrative "depends largely on the aspect in reference to which the question is presented." Also judicial functions thought of as court functions are those which traditionally and peculiarly belong to the courts distinctively from all other bodies, such as criminal trials, which function includes the power to judge and impose or recommend what the punishment shall be, and those functions performed by an institution called a court which possessed the machinery and used it for redress of wrongs arising from the violation of rights recognized by common law or given by statute and made redressable by court action. These were looked on from time immemorial as the traditional and peculiar functions of the courts, although even here it is unsafe to generalize too far. To conclude on this phase of the case: It is not required that we determine whether the commission was exercising an executive, legislative or judicial function. All we need determine at this time is that it is not exercising a judicial function, construed as that term is in reference to courts, and thus that res adjudicata is not applicable. I place my concurrence in regard to this phase of the case on that proposition.

Nor is it necessary in this case to determine whether the Public Service Commission may, without a change in conditions or situation, entertain anew an application for a certificate of convenience and necessity based on substantially the same evidence which formerly resulted in a denial. In this case there was a change of condition. But there is tenability in the argument that, the function exercised in this case being one to determine whether the public interests require a certificate of convenience and necessity, such matter should never be foreclosed. Certainly where cities or towns grant franchise it is done by the legislative bodies of those cities and towns, which, by the way, gives additional color to the argument that this is a legislative function. I know of no case where a city council acted to deny a franchise where it could not again be considered and granted by the assembly except on a shown change of conditions. As yet city and town legislative bodies have not found it necessary, granted they had been given such power by the state legislature or their charters, to set up administrative agencies to perform such apparently legislative functions. It is rather common knowledge that in cities where the council is the legislative body and the mayor the executive, the legislative branch has usually been very loath to part with this privilege of granting or withholding franchises.

There is, of course, something to be said for the proposition that there should be some certainty to the Commission's conclusions and protection against repeated applications for the purpose of wearing down the Commission or the protestants. Perhaps we must ascribe sufficient common sense to the Commission as to justify a faith that it would not entertain an application under like circumstances unless it was definitely of the opinion that the prior refusal to grant the certificate was wrong. Be that as it may, in this case there appears to be alleged and shown a change of conditions as compared with those existing at the time of the former hearing, in that there was a marked increase

in business which may have made the issuance of the certificate a matter of convenience and necessity under the greater business activity at the later date. We note, in this respect, that the subsequent application here under consideration was on the Commission's printed form and, therefore, identical in most respects with the former application for which the same form was used. However, some routes are sought to be covered by the present application in addition to those covered by the earlier one. Since, under Section 76-6-1, R. S. U. 1933, the form of the application would not limit the nature of the evidence to be presented in behalf of the application, the Commission would have to proceed with the hearing of the evidence, at least to the extent of determining whether there was a changed situation, granted such was necessary, to justify a consideration of the merits of the new application. Assuming, though not deciding, that such a showing was necessary, the record indicates such to have been presented in this case, particularly since the record shows evidence was presented as to the financial condition of the competitors, as to an increase in freight rates, new industries, an increase in the demand for truck carriers, and a condition detrimental to the public interest in the increase in the use of private carriers along routes not covered by the previously authorized runs of the Fuller-Toponce Truck Company. The Commission's order indicates a particular concern over the use of private carriers, in the fact that much of this would likely be abolished if further truck runs were authorized, and in the fact that the use of private carriers indicates that the competing railroads do not get this business and would not therefore, suffer to the extent claimed, by the granting of this application. In the light of the record it is clear that the Public Service Commission was not, in this case, faced with the necessity of determining whether, in the absence of a change of conditions, it should proceed to entertain anew this application, nor need we here determine that question.

PRATT, Justice (dissenting).

I dissent. Clearly the legislature intended finality to the Commission's decisions after rehearing and appeal or after the period provided therefor has expired. If not, then sections 76-6-15 and 76-6-16 of our Public Utility Law are nullities. Of what use to a protestant is a rehearing, or a favorable decision on appeal, if the applicant may file a new application covering the same set of circumstances, and obtain what the Commission originally denied him? How many times may the applicant force the protestant through such useless red-tape? Common sense tells us that decisions of the Commission, when once they become final should not be changed but upon a showing of a change of circumstances.

In the present case it appears from the Commission's findings that the matter has been once heard, determined adversely to applicant, appealed and sustained. Now the Commission is reversing itself upon the same set of circumstances. If that is permitted, how long will they adhere to this later decision? It this to continue until one side or the other falls with exhaustion?

It is suggested that no harm is done because the Commission has a rule that a new application may not be filed within a year. If the Commission is as "arbitrary" and "capricious" as applicant, claimed it was in its first case before this court (*Fuller-Toponce Truck Co.* v. *Public Service Commission*, 99 Utah 28, 96 P. 2d 722), then no doubt it will not become conscience stricken if it should reduce that one-year rule to a period of a day after any decision upon its merits.

It may be error to speak of the Commission's decision, as distinguished from the decision of a court, as res adjudicata, but be the name what it may, the legislature intended finality to the decision. If no change of circumstances is required, then why the necessity of a hearing before recision, alteration, or amendment of an order or decision under and pursuant to section 76-6-13 of the Public Utility

Law? Notice also what is said about finality in section 76-6-14.

MOFFAT, C. J., concurs in the views expressed in the opinion of PRATT, J.