## UNION PAC. R. CO. et al. v. PUBLIC SERVICE COMMISSION et al.

No. 6468.   Decided April 10, 1943.   (135 P. 2d 915.)

*George H. Smith, E. C. Jensen, John D. Rice, Sam D. Thurman,* and *Van Cott, Riter & Farnsworth,* all of Salt Lake City, and *L. M. Bradshaw,* of San Francisco, Cal., for plaintiffs.

*Grover A. Giles,* Atty. Gen., *A. U. Miner,* Asst. Atty. Gen., and *Grant Macfarlane,* of Salt Lake City, for defendants.

LARSON, Justice.

Certiorari to Public Service Commission. The Interstate Motor Lines, Inc., an interstate motor carrier of commodities generally, hereinafter called the Motor Lines, operated

across Utah in interstate commerce. As far as material here, its line of operation ran from Ogden, Utah, south to Salt Lake City, thence west over U. S. Highways number 40 and 50 to the Utah-Nevada line, thence westward through Nevada to the coast. Having no intrastate permit, it could not pick up commodities along its route through this state unless consigned to a point beyond the state. With the establishment of the U. S. Air Base at Wendover, Utah, and the nearby Bombing Range, shipment of commodities from the Ogden and Salt Lake area to Wendover greatly increased. Wendover, Utah, is situate on Highways 40 and 50, about five miles east of the Nevada state line, and at the time of the hearing had an estimated population of about 382, besides a floating population (people in and out) of about 500. Then there are the soldiers at the Wendover Air Base. Just over the Nevada line is West Wendover, having a population less than one-third that of Wendover, Utah. The Western Pacific Railroad Company operates a standard railroad line from Salt Lake City, west through Wendover, and on to California. It, together with its co-plaintiffs here, Union Pacific Railroad Company, Bamberger Electric Railroad Company, and the Denver and Rio Grande Western Railroad Company, hereinafter called the Railroads, operated as both interstate and intrastate carriers of commodities generally, although only the Western Pacific went to Wendover. On July 28, 1941, the Motor Lines filed an application before the Public Service Commission of Utah, hereinafter called the Commission, for a Certificate of Convenience and Necessity to operate as a common motor carrier of commodities generally, except livestock, in intrastate commerce between two specified districts: Ogden and Salt Lake City and intermediate points, including Hill Field and adjacent military projects near the Ogden Arsenal, as one district, and as the other district, all points west of Grantsville to and including Wendover, Utah, and the Wendover Bombing Range. No points between Salt Lake City and the West side of Grants-

ville· were to be served in intrastate commerce. The Railroads protested the application. After a hearing, the Commission granted the permit as sought, and the Railroads. bring certiorari, presenting but one question:

Does the evidence justify the holding of the Commission that public convenience and necessity requires intrastate. motor common carrier service along U. S. Highways 40 and 50, between Ogden and Salt Lake City area on the one hand,. and Wendover, Utah, on the other hand, such as granted to Motor Lines by the Commission?

The rule is so well established as to require no citation of authority that the reviewing power of the court is confined to the questions as to whether the Commission regularly pursued its authority, whether its findings are justified by the evidence, and whether its orders contravene any right under the Constitution of the United States or the Constitution of the State of Utah. By the records before us, our investigation is confined to an examination of the evidence, to see if the findings and holdings of the Commission that public necessity and convenience requires the service permitted finds justification there-- in. The findings are assailed on two grounds: (1) The evidence does not justify the finding that the Army Air Corps Base at Hill Field has need for the service granted in the certificate under consideration; (2) The evidence does not justify a conclusion that the existing service is not ample and adequate. As to the first attack, we must concede the point well taken. There is no evidence in the record, nor any evidence from which it would be inferred, that the Army Air Base has any special need for the particular service involved in this certificate. The only evidence on the question was given by Payne, a shipping clerk at Hill Field, who testified that the present services by rail to Wendover, Utah, or by motor line to Wendover, Nevada, was adequate except where a plane was forced down and they desired to rush a special order or part out to it be- tween times of regular schedules of carriers, and when such

is the case, they prefer to send their own trucks which go direct to the plane. The president and manager of Motor Lines testified that it did not want and would not render such special service; that no special runs, no trips outside regular schedules would be made in less than carload lots, (10,000 pounds or over). Such finding of the Commission, if considered as an independent need or reason for the added service, would find no justification in the evidence.

As to the second ground of attack, the evidence is of a different character. The record discloses that the Western Pacific Railroad operates one local freight train daily from Salt Lake City to Wendover, Utah, and one Railway Express train daily. These trains leave Salt Lake City in the evening. The Motor Lines operate daily two trucks westbound from Salt Lake City to Nevada, both leaving Salt Lake City in the evening. Its shipments picked up in Utah are delivered to Wendover, Nevada, sometimes called West Wendover, and from there, many of them backhauled about five miles to Wendover, Utah. The railroads on express shipment furnish refrigeration. Motor Lines also furnish refrigeration. The railroads, other than Western Pacific do not operate to Wendover but do bring shipments of freight and express to Salt Lake City, where it is transferred to Western Pacific for delivery at Wendover. The Bamberger operates three daily trains from Ogden to Salt Lake City, and has rail connections directly with Hill Field. The Union Pacific has direct rail connections to the Ogden Arsenal by trains coming to Salt Lake City. There are no complaints in the record as to the frequency or quality of service rendered by the Railroads. The more detailed bits of information in the records are as follows: The Railroads, as far as the record shows, delivered from Salt Lake City to Wendover, Utah, an unspecified amount of lcl. freight and approximately 26,000 pounds of express per month. Motor Lines were hauling from Salt Lake City to Wendover, Nevada, freight to the amount of approximately 150,000 pounds monthly, approximately 90,000 pounds of

which destined for people in Wendover, Utah, was then backhauled by the consignees five miles to Wendover, Utah. Shipments over the railroad were delivered at the depot in Wendover, Utah, where the consignee called for the goods. Motor Lines as part of its service proposed a store-door pick-up and delivery; that is, it proposed to call at the consignor's place of business for the commodities, and deliver them to the place of business or residence of the consignee. The question is therefore whether the elimination of the back haul from Wendover, Nevada, to Wendover, Utah, and the store-door pick-up and delivery constitute such new, added, further or better service as to justify a finding of public convenience and necessity.

Motor Lines are already operating over the route in interstate commerce. They may and do in part serve the territory involved, by carrying commodities between the district involved, through the use of its station at Wendover, Nevada. The fact that with the 5 mile back haul by consignees from its Nevada station to Wendover, Utah, it has still acquired a volume of business to the extent indicated above, is certainly evidence that many shippers and consignees find its service more convenient or desirable than that of the Railroads. This may sustain a conclusion that such service was so much more convenient that it justified the consignee in making a five mile trip to Nevada and return for the commodities. It does not follow we would so conclude. The Commission as reasonable men might have done so. As to what is meant by "public convenience and necessity" was discussed and considered by us in *Mulcahy* v. *Public Service Comm.*, 101 Utah 245, 117 P. 2d 298, 300, where we reviewed many of the authorities dealing with the question. We there stated, inter alia:

"Necessity means reasonably necessary and not absolutely imperative. * * * The convenience of the public must not be circumscribed by holding the term 'necessity' to mean an essential requisite. * * * It is necessary if it appears reasonably requisite, is suited to and tends to promote the accommodation of the public. * * * The statute should be so construed and applied as to encourage rather

than retard * * * the quality of the service rendered to the public * * * to the end that both the quality and quantity of that which is offered to the public * * * may be improved and increased * * *. Any service or improvement which is desirable for the public welfare and highly important to the public convenience may properly be regarded as necessary. * * * A service is not necessarily adequate because the community * * * can conduct its business without further or additional service. * * * To be adequate they must safeguard the people generally from appreciable inconvenience in the pursuit of their business * * *. If a new or enlarged service will enhance the public welfare, increase its opportunities, or stimulate its economic, social, intellectual or spiritual life to the extent that the patronage received will justify the expense of rendering it, the old service is not adequate."

In a case generally similar to the one now before us, the New York Public Service Commission, in Re Troy Auto Car Co. (P. U. R. Ann. p. 707), in speaking of necessity and convenience, said:

"It is dangerous to undertake to formulate abstract definitions in deciding a concrete case, but we take it that for such purposes as are involved in this and similar applications, a public convenience and necessity exists when the proposed facility will meet a reasonable want of the public and supply a need, if existing facilities, while in a sense sufficient, do not supply that need."

The Railroads assert that there is no evidence that the service now rendered by them is not adequate, and therefore another certificate could not be granted. Such conclusion does not follow. An adequate rail service may not and cannot always afford an adequate general transportation service. Certainly it would not always be wise to require a railroad company to put on additional trains, or to stop other trains at all small towns to meet the general transportation needs and convenience under present conditions. Convenience and necessity are found, and consist largely, in the changing conditions and demands of the times. There was a time when the covered wagon, river scow, and pony express fairly well served the public needs, but as they became inadequate there arose a need for rail-

road facilities. So too a railroad may function well as railroad transportation and yet in the very nature of things not adequately serve the need of the community. See *Atchison, T. & S. F. Ry. Co.* v. *Public Serv. Comm. of Kansas*, 130 Kan. 777, 288 P. 755.

The policy as declared by the statute, Laws 1935, c. 65, § 6, is not one of granting monopoly in all cases, but is one that at all times deems the public interest of paramount importance. Such acts grew largely out of the fact that so many utilities had become in the very nature of things, virtual monopolies that it was deemed necessary to protect the public interest both as to rates and service against the evils which could flow from monopoly. The discretionary power granted the Commission by the act, to grant or withhold certificates, negatives the idea that it was intended to grant and maintain a monopoly in any field. The fact that the act provides that the Commission may grant a certificate when it determines that public convenience and necessity requires such services recognizes that regulated competition is as much within the provisions of the act as is regulated monopoly. In the exercise of its powers to grant or withhold certificate of convenience and necessity, questions of impairment of vested or property rights cannot very well arise. No one can have a vested right to be free from competition, to have a monopoly against the public. And unless some justifiable question arises, unless some point is juridically present, this court will not substitute its judgment for that of an administrative tribunal, charged by law with carrying out matters of non-judicial character. See *San Diego & Coronado Ferry Co.* v. *Railroad Comm.*, 210 Cal. 504, 292 P. 640; *Kansas G. & E. Co.* v. *Public Service Comm.*, 122 Kan. 462, 251 P. 1097.

The Motor Lines propose to render a public service which the Railroad does not render nor propose to render. That is a store-door pickup and delivery of freight. It sends its own

vehicles to the consignor, and at its own expense picks up all shipments tendered for points within the territory it proposes to serve, and delivers them into the hands of the consignee. On the other hand the railroads require that all shipments be delivered to them at their depots, at shipper's expense, and called for at their depot by consignee, and drayed to his place of business or home at his expense. The railroads concede that this service, as also the elimination of the back haul from West Wendover, to Wendover, Utah, is a convenience, but deny that it is a necessity. We have repeatedly stated that "convenience" and "necessity" are not segregable and to be considered as separate terms, but must be construed together and constitute a joint concept, which must be construed and considered according to the whole concept and purpose of the act. As to what constitutes "public convenience and necessity" must fundamentally have references to the facts and circumstances of each given case as it arises, as the term is not, and was not intended to be, susceptible of precise definition. See opinion of *Federal Power Commission in Kansas Pipe Line* v. *North Dakota Consumers Gas*, 30 P. U. R., N. S., 321; *Yazoo M. R. Co.* v. *Louisiana Pub. Service Comm.*, 170 La. 441, 128 So. 39. We cannot say therefore that the Commission abused its authority and acted arbitrarily in finding that the so-called store-door pickup and delivery service, together with the elimination of the five mile back haul of goods shipped by motor lines is a matter of "public convenience and necessity" within the statute. We cannot consider the expediency or wisdom of the order or whether or not on the evidence we would have made a similar ruling.

The order is affirmed. Costs to defendants.

WOLFE, C. J., and McDONOUGH, and MOFFAT, JJ., and CLARENCE E. BAKER, District Judge, concur.

PRATT, J., on leave of absence.