**BIG K CORPORATION, dba Diamond Transport, Plaintiff,**

v.

**PUBLIC SERVICE COMMISSION OF UTAH; Brent H. Cameron, Chairman, David R. Irvine, Commissioner, and James M. Byrne, Commissioner, Defendants.**

No. 18643.

Supreme Court of Utah.

Sept. 28, 1984.

1350 ▮ ▬▬▬▬▬▬▬▬▬▬

Merlin O. Baker, A. Robert Thorup, Irene Warr, Salt Lake City, for plaintiff.

David L. Wilkinson, Atty. Gen., Stephen Lewis, C. Reed Brown, William S. Richards, Mark Boyle, Donald B. Holbrook, Elizabeth Haslam, Randall N. Skanchy, Salt Lake City, for defendants.

STEWART, Justice:

The plaintiff, Big K Corporation dba Diamond Transport, a motor common carrier, applied to the Utah Public Service Commission for a certificate of convenience and necessity to transport fluids used in drilling wells for oil over irregular routes between points within the state of Utah, with the exception of Uintah and Duchesne Counties. The PSC denied the application, holding that Big K had failed to show that the service provided by existing carriers was deficient. On this appeal, Big K argues that the Commission misconstrued the "deficiency of service" standard and therefore failed to determine whether Big K's proposed service would provide a better service to shippers in northern and central Utah than is provided by the existing carriers. We hold that the Commission erred as a matter of law in its construction of the "deficiency of service" standard.

## I.

Prior to its application to the Utah PSC, Big K had obtained authority from the Public Service Commission of Wyoming to transport drilling fluids between points within the state of Wyoming. Big K was also authorized by the Interstate Commerce Commission to transport drilling

fluids between the states of Utah, Wyoming, Colorado, and Idaho.

Big K's application for intrastate authority in Utah was protested by eight drilling fluid carriers.[1] Its proposal was to use one of its existing terminals in Evanston, Wyoming, to service recently developed northeastern Utah oilfields located in the newly discovered and partially developed Overthrust Belt area, and it also proposed to open a new terminal in Holden, Utah, to service new drilling activity in central Utah. The terminals of all but one of the protestants are located near Vernal in proximity to the eastern Utah oil fields, which are old, established areas of oil exploration and production.[2] Those fields are separated from the northeastern areas by the Uintah Mountains. Land transportation between Vernal and the latter fields is long and round-about.

Big K operates a fleet of thirty-one trucks for hauling drilling fluids. Drilling activity has increased in Utah significantly over the past twenty years. From 1976 to 1981, drilling activity increased statewide some 165%. The Commission found that drilling activity would likely continue to increase in the future because of the discoveries in the Overthrust Belt which is thought to extend the length of the state. The Overthrust Belt is one of the major oil discoveries in the continental United States during the past several decades.

In support of its application, Big K adduced the testimony of six shippers who supported the proposed service. Three oil drillers who operated in areas distant from Vernal testified that the long distances the drilling fluids were hauled had caused them delays, increased their expenses, and compounded the problems of adequate water service. Big K also adduced evidence that oil drilling in Utah had increased consistently over the past two decades and was likely to continue to increase.

The protestants sought to establish that no need existed for additional service in northeastern and central Utah. Their evidence indicated that they were able and willing to provide additional service to the shippers located in the areas Big K proposed to serve, that their equipment for transporting oil drilling fluids was underutilized, and that they had not refused service to any shipper.

In a two-to-one decision, with Commissioner David Irvine concurring and dissenting, the Commission held that Big K met the requisite fitness criteria to qualify for a certificate of public convenience and necessity. Specifically, Big K was found to be financially stable; its prior operations were in compliance with the various regulatory provisions of the law, and its operational capabilities were sufficient to enable it to perform the proposed service. The Commission also ruled, however, that there was no public need for the additional service. The Commission stated:

We now turn to the second requirement, public need for the proposed service. This requirement normally causes new applicants the most trouble. It puts a considerable burden on an applicant because, if the proposed service duplicates that existing, we have consistently held that an applicant must show either deficiencies in the existing service (something more than sporadic, *de minimis* failures), or a prospective growth in the market sufficiently substantial to justify additional service....

What may be loosely termed the "deficiency in service" requirement does afford existing carriers considerable protection from increased competition. It also protects their investment in operating rights, which may be substantial.

In addition, the Commission found that "drilling activity in Utah will likely continue to increase, [and the] potential need for additional service of the type sought in the

1. They are Black Hills Trucking; Duane Hall Trucking; D.E. Casada Rig & Construction Contractor; Hay Hot Oil, Inc.; Liquid Transport; Matador Services; Sunco Trucking Co.; and Target Trucking, Inc.

2. One carrier has its main terminal in San Juan County, in the southeastern corner of the state.

application [and] the present and immediately foreseeable level of activity" did not indicate a need for additional service. The Commission also found that the equipment of the protestants was under-utilized and that they had not refused to service the shipping public. The Commission concluded that Big K had failed to show a public need for the proposed service because there was no "deficiency of service."

Commissioner Irvine concurred in the findings and conclusion that Big K met the fitness criteria, but dissented on the standard to be applied in determining public need. In his view, the majority misconstrued this Court's holding in *Lake Shore Motor Coach Lines, Inc. v. Bennett*, 8 Utah 2d 293, 333 P.2d 1061 (1958). Specifically, he disagreed with the majority that *Lake Shore* required a finding of a "deficiency of service," at least as the Commission construed that term, before the Commission could grant new authority. He contended that a deficiency of service was only one factor among several to be weighed in determining whether public convenience and necessity required the authorization of new service.

## II.

 It is axiomatic that we accord the ruling of the Public Service Commission differing degrees of deference according to the nature of the issue reviewed. *Utah Department of Administrative Services v. Public Service Commission*, Utah, 658 P.2d 601, 608–09 (1983). With respect to factual issues, the scope of our inquiry is whether the findings are supported by substantial evidence. We will not reweigh conflicting evidence. It is our duty to determine only whether there is substantial evidence to support a finding. *See id.* at 608–09; *Harry L. Young & Sons, Inc. v. Public Service Commission*, Utah, 672 P.2d 728, 729 (1983). In determining whether the Commission correctly construed general principles of law, whether statutory or case law, we generally do not defer to the Commission. *Utah Department of Administrative Services v. Public*

Service Commission, Utah, 658 P.2d 601, 608 (1983); *Utah Light & Traction Co. v. Public Service Commission*, 101 Utah 99, 118 P.2d 683 (1941); *Mulcahy v. Public Service Commission*, 101 Utah 245, 117 P.2d 298 (1941). *Cf. Trotta v. Department of Employment Security*, Utah, 664 P.2d 1195, 1198 (1983). Even with respect to the Commission's construction of its organic statute, we do not defer unless the Commission by virtue of expertise and experience with the regulatory scheme is in a superior position to give effect to the regulatory objectives to be achieved or the terms of the statute make clear that the Commission was intended to have broad discretion in construing those terms. *Salt Lake City Corp. v. Department of Employment Security*, Utah, 657 P.2d 1312, 1316 (1982).

In reviewing the Commission's application of the "deficiency of service" test in the motor carrier industry, we are concerned with the terms of the governing statute and our own case law construing that statute with respect to the extent to which the statute contemplated that regulation rather than competition was to be relied upon to further the public interest in motor common carriage.

## III.

The Motor Vehicle Act of 1935 subjected the motor carrier industry to governmental regulation as the primary means of protecting and furthering the public interest.[3] Prior thereto, the policy of the state was to rely upon the forces of competition in a free market place, subject to the general protection of the antitrust laws, to provide reasonable rates and adequate service. Under the new statutory policy, free entry into the market place was displaced by entry wholly controlled by the Public Service Commission. U.C.A., 1953, § 54–6–5 empowers the Commission to authorize new service by granting a certificate of convenience and necessity if the Commission finds that "the public convenience and necessity require the proposed service or any part thereof." "Necessity" means

---

**3.** *See* Laws of Utah 1935, chapters 65 and 66.

"reasonably necessary and not absolutely imperative.... Any service or improvement which is desirable for the public welfare and highly important to the public convenience may properly be regarded as necessary." *Mulcahy v. Public Service Commission,* 101 Utah 245, 250–51, 117 P.2d 298, 300–01 (1941).

The issue in this case is whether the public convenience and necessity would be served by granting new authority to Big K or whether existing carriers should be protected from that competition. *Lake Shore Motor Coach Lines, Inc. v. Bennett,* 8 Utah 2d 293, 297, 333 P.2d 1061, 1063 (1958), set out the following test for determining whether new common carrier authority should issue:

> Our understanding of the statute is that there should be a showing that existing services are in some measure inadequate, or that public need as to the potential of business is such that there is some reasonable basis in the evidence to believe that public convenience and necessity justify the additional proposed service.

*Accord Harry L. Young & Sons, Inc. v. Public Service Commission,* Utah, 672 P.2d 728, 730 (1983); *PBI Freight Service v. Public Service Commission,* Utah, 598 P.2d 1352 (1979); *Mulcahy v. Public Service Commission,* 101 Utah 245, 117 P.2d 298 (1941).

■ In determining whether the public interest and necessity are served by additional service, the Commission must consider numerous factors. It must weigh the benefits to be derived from increased competition, such as the potential beneficial effect upon rates, customer service, the acquisition of equipment more suitable to customer needs, the efficient use of equipment, greater responsiveness in meeting future shipper needs, and greater efficiency in the use of route structures and interlining arrangements. In *Union Pacific Railroad Co. v. Public Service Commission,* 103 Utah 459, 466, 135 P.2d 915, 918 (1943), this Court stated that "regulated competition is as much within the provisions of [§ 54–6–5] as is regulated monopoly.... No one can have a vested right to

be free from competition, to have a monopoly against the public." The role of competition in motor carrier regulation has been long recognized by other courts as well. In *Schaffer Transportation Co. v. United States,* 355 U.S. 83, 91, 78 S.Ct. 173, 178, 2 L.Ed.2d 117 (1957), the United States Supreme Court stated a long-standing policy applicable to the regulation of motor common carriers:

> "[N]o carrier is entitled to protection from competition in the continuance of a service that fails to meet a public need, nor, by the same token, should the public be deprived of a new and improved service because it may divert some traffic from other carriers."

*Cf. McLean Trucking Co. v. United States,* 321 U.S. 67, 86, 64 S.Ct. 370, 380, 88 L.Ed. 544 (1944) ("the Motor Carrier Act is to be administered with an eye to affirmatively improving transportation facilities, not merely to preserving existing arrangements ..."). *See also Chief Freightlines Co., Extension Dallas, Texas,* 126 MCC 794 (1977). "Even where Congress has chosen Government regulation as the primary device for protecting the public interest, a policy of facilitating competitive market structure and performance is entitled to consideration." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 298, 95 S.Ct. 438, 448, 42 L.Ed.2d 447 (1974).

■ Of course, the Commission may not wholly disregard the effect that additional competition may have on existing carriers. *See Lake Shore Motor Coach Lines, Inc. v. Bennett,* 8 Utah 2d 293, 296, 333 P.2d 1061, 1063 (1958); *Salt Lake & Utah Railroad Corp. v. Public Service Commission,* 106 Utah 403, 408, 149 P.2d 647, 649 (1944); *Utah Light & Traction Co. v. Public Service Commission,* 101 Utah 99, 113–15, 118 P.2d 683, 690–91 (1941). The Commission must not undercut the ability of efficiently operated carriers to achieve sufficient financial stability so that they can provide reliable service, comply with public safety regulations, and conform with other business regulatory policies that further economic development and the growth of new industries. *See gener-*

*ally Lake Shore Motor Coach Lines, Inc. v. Bennett, supra; Mulcahy v. Public Service Commission, supra.* Nevertheless, the fact that additional competition will divert revenues from existing carriers is not a valid reason by itself to justify a denial of additional authority.

The ultimate criterion against which all relevant factors are to be evaluated is the "public good and convenience," *Salt Lake & Utah Railroad Corp. v. Public Service Commission,* 106 Utah 403, 408, 149 P.2d 647, 649 (1944), not the existing carriers' convenience and necessity. *See Lake Shore Motor Coach Lines, Inc. v. Welling,* 9 Utah 2d 114, 120, 339 P.2d 1011, 1014–15 (1959). Except where market conditions require otherwise, such as where markets are too small to support an additional carrier, or a new carrier seeks to "cream" a market to the detriment of other carriers or small shippers, competition is almost always an affirmative factor in furthering the public convenience and necessity.

Our construction of the term "public convenience and necessity" to foster competition when feasible is not inconsistent with § 54–6–4. That section provides that the Commission should prevent unnecessary duplication of services between motor common carriers. The section was not intended to freeze monopoly or tightly oligopolistic markets irrespective of the benefits competition may provide. It is not the policy of § 54–6–4 to favor automatically the fewest number of carriers possible in a given market. Competition necessarily always involves duplication of services. Duplication of services is not "unnecessary" if competition will provide a better service or lower rates. Rather, § 54–6–4 was intended to prevent the kind of predatory, below-cost competition that threatens the adequacy of service and the soundness of the transportation industry.

Obviously, however, the policy of the Motor Carrier Act is not unrestrained competition. Free market entry is expressly foreclosed. Pursuant to § 54–6–5, all new entrants must prove that additional service is consonant with the public conve-

nience and necessity. That may be demonstrated by showing the inadequacy of the current service or the need to fulfill increased future demand for motor carrier services. *E.g., Harry L. Young & Sons, Inc., supra; Mulcahy v. Public Service Commission, supra.*

Inadequacy of service is, however, a broader concept than simply the absence of service. *Ashworth Transfer Co. v. Public Service Commission,* 2 Utah 2d 23, 30, 268 P.2d 990, 995 (1954). A service may be inadequate if it does not meet the reasonable needs of consignors or consignees. "[A] service is not necessarily adequate because [a] community can 'get by,' can conduct its business without further or additional service." *Mulcahy, supra,* 101 Utah at 252, 117 P.2d at 301. Thus, "inadequacy of service," encompasses both substandard service and service that is subject to improvement. Inadequacy of service need not necessarily be established by evidence of actual shipper dissatisfaction with existing carrier service.

*Uintah Freight Lines v. Public Service Commission,* 118 Utah 544, 223 P.2d 408 (1950), is clearly on point. It established the proposition that the existing service may be inadequate simply by comparison with improvements offered by an applicant's proposed service. The applicant proposed providing common carrier service from a terminal in Price, Utah, to serve shippers located in eastern Utah. Both of the applicant's chief competitors had their terminals in Salt Lake City, Utah, a considerable distance both in time and miles from the shippers to be served. The Court sustained the Commission's grant of new authority because the applicant could "offer shippers in that area service with much less delay than ... carriers which [had] their equipment stationed in Salt Lake City ...." *Id.* at 551, 223 P.2d at 411.

*PBI Freight Service v. Public Service Commission,* Utah, 598 P.2d 1352 (1979), also sustained the Commission's grant of new authority because the applicant, PBI, could provide better service than the certificated carriers. PBI had more of a type of

equipment needed by the shippers served than the protestants and also provided through service, while the protestant carriers had to interline with other carriers to offer a similar service. *Compare Lewis v. Wycoff Co.*, 18 Utah 2d 255, 420 P.2d 264 (1966) (quicker service); *Lake Shore Motor Coach Lines v. Welling*, 9 Utah 2d 114, 339 P.2d 1011 (1959) (new type of service); *Union Pacific Railroad Co. v. Public Service Commission*, 103 Utah 459, 135 P.2d 915 (1943) (store door pick up and delivery).

■ In the instant case, the evidence before the Commission indicated that the applicant's proposed service would benefit those shippers located in the northern and south central regions of the state. The long hauls from the terminals of the existing carriers to those shippers result in less efficient service and greater expense for the shippers in an industry in which time is a matter of considerable importance in the service rendered. Commissioner Irvine noted that the service would "be considerably more convenient to [Summit and Rich Counties in northern Utah, western Utah, and south central Utah], and service could be provided more rapidly when necessary. There are few enterprises so costly or more illustrative of the maxim 'time is money' than is exploration for oil and gas."

In denying Big K's application, the Commission erred in its failure to properly define the "inadequacy of service" standard. Thus, the Commission's finding that the existing service was adequate solely because no shipper was wholly deprived of service was based on an error of law. As a consequence, the order of the Commission must be set aside and the case remanded for the Commission to reevaluate the evidence and make new findings in light of this opinion.

## IV.

■ Big K raises three other issues. First, it contends that the Commission erred in striking the testimony of Michael Minder, a petroleum engineer with the Utah State Division of Oil, Gas, and Mining, that more water haulers were needed in Utah. The opinion had an adequate foundation arising from Minder's experience and expertise in the petroleum industry and was not objectionable on the ground that Minder gave it in response to a Commissioner's question. It is indeed the duty of the Commission to see to it that relevant evidence is not ignored. The Commission, though it acts in a quasi-judicial function and must be impartial as between the parties, need not take a passive stance in protecting the public interest. Thus, the Commission erred in striking the testimony because it was elicited as a result of a Commissioner's question.

■ Second, the last sentence of § 54-6-5 provides that the Commission shall not grant a certificate of public convenience and necessity if it would "be detrimental to the best interests of the people of the State of Utah." Big K argues that the Commission erred in not making such a finding. We think the Commission did not err. By its terms, § 54-6-5 requires the Commission to find, as a predicate to granting a certificate, that the "public convenience and necessity require the proposed service." That finding must necessarily preclude "the possibility that the granting of the application will be 'detrimental to the best interests of the people of the state of Utah' within the meaning of the statute." *Harry L. Young & Sons, Inc. v. Public Service Commission*, Utah, 672 P.2d 728, 732 (1983).

Finally, Big K argues that the Commission found that a potential need for future service exists and that Big K is entitled as a matter of law to the requested authority to fill that need. That conclusion does not necessarily follow.[4] Whether Big K or ex-

---

**4.** The Commission found:

 8. Drilling activity in the state of Utah has expanded consistently during the past 20 years. In the five-year period from 1976 through 1981, drilling activity has increased statewide some 165%. From 1960 through 1981, the Notices of Intent to Drill which have been filed with the State increased 720%. Existing carriers have been able to meet the increased demand.

 9. The record reflects indications that drilling activity in Utah will likely continue to

isting carriers should fill future needs depends upon the Commission's determination of all factors bearing upon the public convenience and necessity, including the desirable effects that may be produced by additional competition.

Reversed and remanded for further consideration.

HOWE and DURHAM, JJ., and ERNEST F. BALDWIN, Jr., District Judge, concur.

HALL, C.J., having disqualified himself, does not participate herein; BALDWIN, District Judge, sat.

ZIMMERMAN, J., does not participate.

increase. The Overthrust Belt, which extends the length of the State, is one of the most promising areas for the drilling of hydrocarbons in the United States. Only 10% of the Overthrust Belt has been explored for hydrocarbons, and it is possible a major find in Utah could cause an explosive growth in drilling activity. There are thus indications of a potential need for additional service of the type sought in this application. The evidence in this case is, however, that the present and immediately foreseeable level of activity does not so indicate.